**RE-94-366**                                                                 1

En el Tribunal Supremo de Puerto Rico

| José Manuel Elías Vega y Otros Demandantes-Recurrentes V. Paul C. Chenet y Otros Demandados-Recurridos | Recurso de Revisión TSPR99-0013 |
|---|---|

Número del Caso: RE-94-366

Abogados de la Parte Recurrente: Lcdo. Roberto de Jesús Cintrón

Abogados de la Parte Recurrida: Lcdo. José E. Otero Matos, Lcdo. José E. Soler Ochoa, Lcdo. Rafael A. Fuster Martínez, Lcdo. Nelson Rivera Cabrera, Lcdo. Rafael Mayoral Morales, Lcda. Elisa M. Figueroa Báez y Lcdo. Carlos A. Ramos

Abogados de la Parte Interventora:

Tribunal de Instancia: Superior San Juan

Juez del Tribunal de Primera Instancia: Hon. Dora T. Peñagarícano

Tribunal de circuito de Apelaciones:

Juez Ponente:

Fecha: 2/16/1999

Materia: Daños y Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

José Manuel Elías Vega y otros

    Demandantes-recurrentes

                v.                    RE-94-366          REVISIÓN

Paul C. Chenet y otros

    Demandados-recurridos

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 16 de febrero de 1999

Acude ante nos la parte demandante, mediante auto de revisión, solicitando la revocación de la <u>sentencia sumaria parcial</u> dictada el 13 de junio de 1994 por el antiguo Tribunal Superior de Puerto Rico, Sala de San Juan. Mediante dicha sentencia sumaria se exoneró de responsabilidad, por alegada impericia médica, al co-demandado Dr. Fernando Montilla; ello al amparo de las disposiciones de la Ley Núm. 139 de 3 de junio de 1976, 20 L.P.R.A. sec. 31, también conocida como la "Ley del Buen Samaritano".

Como es sabido, esta medida legislativa exime de responsabilidad civil extracontractual a ciertos

profesionales y servidores públicos quienes, por razón de su adiestramiento especializado, prestan servicios o asistencia a la ciudadanía en situaciones de emergencia. En el caso de autos, el tribunal de instancia entendió que al Dr. Montilla le cobijaban las disposiciones de esta Ley al determinar que cumplía con todos los requisitos que establece dicho estatuto para su aplicación, dictando sentencia sumaria parcial a favor de éste.

I

La señora Gloria Meléndez de Elías, esposa, madre y hermana de los demandantes, fue admitida al Hospital San Jorge el 16 de noviembre de 1981, por orden de su médico, el Dr. Paul C. Chenet, para someterse a una cirugía para remover una hernia ublical-incisional. El Dr. Chenet comenzó a realizar la intervención quirúrgica en la mañana del día siguiente, 17 de noviembre, en la sala de operaciones "C" del Hospital San Jorge.

El recurrido Fernando Montilla es doctor en medicina y ha ejercido la profesión, continua e ininterrumpidamente, por más de treinta años. El referido galeno es especialista en obstetricia y ginecología y para la fecha de los hechos pertenecía a la facultad activa del Hospital San Jorge.

El 17 de noviembre de 1981, día en que estaba programada la operación de la Sra. Meléndez de Elías, el Dr. Montilla estaba practicando una intervención quirúrgica, conocida como

cesárea, a otra paciente en la sala de operaciones "A" del referido Hospital. Mientras practicaba dicha cesárea, una enfermera entró al quirófano y solicitó del codemandado, Dr. Montilla, que acudiera a la sala de operaciones "C" porque se había suscitado una emergencia "bien grande" en el campo de la obstetricia. El Dr. Montilla interrumpió la cesárea que estaba llevando a cabo, dejando a su socio, el Dr. Randolph J. McConnie, a cargo de la cesárea que estaba realizando y pasó a la referida sala de operaciones "C".

Según surge de la deposición que le fuera tomada al Dr. Montilla, al llegar a la sala de operaciones "C", él encontró a la Sra. Meléndez de Elías con el vientre abierto, completamente lleno de sangre el mismo y la paciente en estado de "shock"[1]. El referido galeno afirma que introdujo su mano en el bajo vientre de la mencionada paciente, levantó su matriz y encontró un quiste en el ovario derecho que estaba sangrando activamente. Inmediatamente, el Doctor Montilla aplicó dos pinzas, una a cada lado del ovario sangrante, y removió el mismo entre ambas pinzas y amarró los

---

[1] El <u>Attorneys' Dictionary of Medicine and Word Finder</u> de J.E. Schmidt Md. define "shock" de la siguiente manera:

> "A desperate physical and mental condition characterized by paleness, clammy respiration <u>abnormally low blood pressure, weak but rapid pulse</u>, fear, restlessness, confusion, fright, <u>loss of blood</u>, pain, burns, surgery, drug reaction, mycardial infarction, dehydration, etc. The exact mechanism or nature of shock is not understood but there is a breakdown and derangement of many important functions of the body. <u>The outstanding change is the fall in blood pressure. The circulation of the blood in the superficial parts of the body is specially impaired</u>. This may be due to a relaxation or dilation of the large blood channels, so there is not enough blood to fill the entire system, especially the smaller arteries and veins near the surface."

muñones ("stumps") doblemente con una sutura de CCG-1. Según el Dr. Montilla, una vez se cercioró de que los muñones no estaban sangrando, que el problema inmediato estaba resuelto y que no había nada más que pudiese hacer por la paciente, "entregó" nuevamente la paciente al Dr. Chenet para que éste continuara con su operación[2]. Acto seguido, regresó a la sala de operaciones "A", para continuar con la cesárea que había estado llevando a cabo.

Luego de este incidente, el Dr. Montilla no tuvo ninguna otra intervención con la paciente del Dr. Chenet. Ese mismo día, murió la Sra. Meléndez de Elías a consecuencia de un "shock" hipovolémico post operatorio[3].

Así las cosas, los familiares de la fenecida presentaron una demanda en daños y perjuicios contra el Dr. Chenet, el Dr. Montilla y el Hospital San Jorge, entre otros. Los demandantes alegaron, en lo pertinente, que el Dr. Montilla es doctor en medicina, especializado en obstetricia y ginecología, que para la fecha de los hechos era miembro de la facultad médica del Hospital San Jorge, que era Jefe del Departamento de Obstetricia y Ginecología de dicho Hospital y, como tal, empleado y agente del mismo, y que practicaba

---

[2]  Entre los co-demandados, Dr. Paul C. Chenet y el Dr. Fernando J. Montilla, no existe ninguna relación profesional o económica.

[3]  El Attorneys' Dictionary of Medicine, op. cit., define el"shock" hipovolémico de la siguiente manera:

> "Shock resulting from a sudden loss of a substantial amount of blood or the fluid constituent of the blood, as in diarrhea, vomiting, hemorrhage, etc." (A la pág. H-261.)(Enfasis suplido.)

servicios médicos para beneficio de dicho Hospital, en el que se le había reconocido el privilegio para utilizar sus instalaciones, así como atender a pacientes que allí fueren hospitalizados.

Alegaron además que los dos médicos demandados --el Dr. Chenet y el Dr. Montilla-- intervinieron quirúrgicamente con la paciente, prestando sus servicios médicos en forma negligente, descuidada y atolondrada y, que por su impericia, fueron los únicos responsables por la muerte de la misma. Los demandantes adujeron que, contrario al procedimiento quirúrgico consentido por la paciente, el Dr.Chenet le practicó una lipectomía, en cuyo procedimiento se le provocó la ruptura de un alegado quiste-ovárico, razón por la cual se produjo una hemorragia. Alegaron, además, los demandantes que al Dr. Montilla extirpar y ligar la ruptura del quiste ovárico, en forma negligente e inadecuada, se produjo la severa hemorragia que causó la muerte de la Sra. Gloria Meléndez de Elías.

El codemandado, Dr. Montilla, contestó la demanda negando todas las alegaciones de la misma. Posteriormente, presentó una moción de sentencia sumaria alegando, en síntesis, que su intervención con la paciente no había sido negligente. La referida moción originalmente fue declarada sin lugar por el tribunal de instancia, Honorable Juez José E. Brocco Oliveras, mediante resolución del día 26 de noviembre de 1986, por éste entender que debía celebrarse una

vista plenaria para dirimir si hubo o no negligencia por parte del Dr. Montilla.

Luego de un prolongado trámite judicial, el 2 de noviembre de 1992 el Dr. Montilla radicó una segunda moción de sentencia sumaria, ésta vez amparándose en la citada "Ley del Buen Samaritano". Alegó que su intervención con la fenecida estaba cobijada por la referida Ley, ya que cumplía con todos los requisitos para su aplicación, razón por la cual debía exonerársele de responsabilidad civil.

Los demandantes se opusieron, alegando que el galeno no cumplía con los requisitos que la "Ley del Buen Samaritano" exige para eximirlo de responsabilidad. En específico, alegaron que el Dr. Montilla estaba trabajando en su sitio de empleo, por ser miembro de la facultad del Hospital San Jorge y por, alegadamente, ser el jefe de la Sección de Obstetricia y Ginecología del mismo y que, como tal, tenía la obligación de intervenir en este caso[4]. Alegaron, además, que el Dr. Montilla incurrió en negligencia crasa durante su intervención con la paciente por no haber detenido la hemorragia, como alega el galeno haber hecho.[5]

---

[4] En apoyo de esta alegación, sometieron copia de la deposición que se le tomó al Dr. Montilla el día 18 de julio de 1990, en donde el doctor dice ser parte de la facultad activa del Hospital San Jorge.

[5] En apoyo a la contención de que medió negligencia crasa, los demandantes sometieron la declaración jurada del Dr. Montilla tomada el 20 de febrero de 1986, copia de las notas de enfermería tomadas durante la operación y copia del protocolo de autopsia; todo esto con el propósito de demostrar que existe controversia en cuanto a si el Dr. Montilla detuvo la hemorragia, fundamento en el cual se basan para alegar que medió negligencia crasa en la intervención quirúrgica del doctor con la paciente.

El 13 de junio de 1994 el tribunal de instancia, Honorable Juez Dora T. Peñagarícano Soler, <u>dictó sentencia sumaria parcial a favor del Dr. Montilla</u>. Entendió la mencionada Juez que el Doctor Montilla era acreedor de la exoneración legal que provee dicha Ley, por cumplir con todos los requisitos que la misma exige.

Inconformes, los demandantes acudieron ante este Tribunal en revisión de la referida sentencia, imputando al tribunal de instancia la comisión de los siguientes errores:

> "(1) Erró el Tribunal de Instancia al declarar Con Lugar la Segunda Solicitud de Sentencia Sumaria Parcial cuando existe una controversia <u>bona</u> <u>fide</u> de hechos.
>
> (2) Erró el Tribunal Sentenciador en su interpretación de la Ley 139, supra y de la doctrina del Buen Samaritano debido a que la misma viola el derecho fundamental de llevar una causa de acción civil según ha sido reconocido por este tribunal en el caso de <u>Alicea v. Córdova</u>, 117 D.P.R. 676 (690) (sic)."[6]

---

[6] Debemos aclarar que ante este Tribunal la parte recurrente hace, en su segundo señalamiento de error, dos planteamientos. Impugna la interpretación que dio el tribunal de instancia a la Ley Núm. 139, <u>ante</u>; y, además, impugna la validez constitucional de dicha Ley. No consideraremos este segundo planteamiento por no haberlo planteado ante el tribunal de instancia.

En reiteradas ocasiones hemos sostenido que si un señalamiento de error no es expuesto inicialmente ante los tribunales inferiores, no lo consideraremos. <u>Murcelo</u> v. <u>H.I. Hettinger</u>, 92 D.P.R. 411, 426 (1965). Conforme a dicha norma, en <u>Trabal</u> v. <u>Ruiz</u>, 125 D.P.R. 34 (1990), nos negamos a adjudicar cuestiones no planteadas por las partes ante el foro de instancia.

Además, su escueta argumentación sobre la posible inconstitucionalidad del estatuto en controversia, consistente de dos pequeños párrafos, no nos mueve ni nos convence para considerar su planteamiento. <u>Correa Canales</u> v. <u>Marcano García</u>, Opinión y Sentencia de 12 de enero de 1996; <u>Dávila</u> v. <u>Hospital San Miguel</u>, 117 D.P.R. 807 (1986); <u>Díaz</u> v. <u>Tribunal Superior</u>, 93 D.P.R. 79 (1966).

Expedimos el auto radicado. Estando en posición de resolver el mismo, procedemos a así hacerlo.

## II

Antes de pasar juicio sobre la aplicabilidad al caso de autos de la Ley Núm. 139, <u>ante</u>, examinamos el origen y el propósito de este tipo de estatuto.

La Sección 5 de los Principios Eticos de la Asociación Americana de Médicos impone a éstos la <u>obligación profesional</u> de proveer sus servicios cuando estén ante una emergencia médica. No obstante esta obligación profesional, <u>no existe ninguna obligación legal que los obligue a así actuar</u>. Los médicos han estado reacios a proveer su asistencia por miedo a ser demandados por impericia profesional.[7]

Con miras a remediar este asunto, en el año 1959 el estado de California aprobó una "Ley del Buen Samaritano", convirtiéndose en el primer estado de la Unión en aprobar una legislación de este tipo. Desde entonces, todos los estados de la Unión, y el Distrito de Columbia han aprobado estatutos de este tipo con marcadas diferencias en cuanto a las personas cobijadas, el nivel de cuidado requerido y las circunstancias bajo las cuales aplica la inmunidad. <u>Aunque varían considerablemente, todos comparten dos requisitos esenciales, a saber</u>: (1) no debe existir una relación médico-paciente <u>antes</u> de suscitarse la emergencia, y (2) la

---

[7] **39 A.L.R. 3d 222.**

asistencia del médico se debe prestar en el lugar donde ocurre la emergencia[8].

El lenguaje de la mayoría de estos estatutos es ambiguo e impreciso y, muchas veces, carente de historial legislativo al igual que de interpretación judicial que aclare su significado. Es por esta razón que dichas piezas legislativas han sido fuertemente criticadas[9]. Algunos han dicho que las mismas son inefectivas, otros que son innecesarias[10] e injustas[11]. Por consiguiente, la inmunidad que ofrecen estos estatutos continúa siendo un enigma tanto para los médicos como para los abogados y un incentivo ambiguo para promover asistencia en situaciones de emergencia.[12]

Nuestra "Ley del Buen Samaritano" dispone, en lo pertinente, que:

> "Sección 1.- Las personas legalmente autorizadas para ejercer la profesión médica en Puerto Rico, en virtud de la Ley Núm. 22 de 22 de abril de 1931,.. que fuera del curso y del sitio de su empleo o práctica profesional, voluntaria y gratuitamente presten servicios o asistencia de emergencia a cualquier persona,... en el ejercicio de sus funciones voluntarias, quedan exentos de

---

[8] H. R. Steipel, *Good Samaritans and Hospital Emergencies*, 54 Southern California Law Review 417, 422 (1980-1981).

[9] Editorial, *Negligent Samaritans Are No Good*, Medicolegal News, Spring 1979, a la pág. 4; Zaremski, *"Good Samaritan" Statutes: Do They Protect the Emergency Care Provider?* Medicolegal News, Spring 1979, a la pág. 5; *Stalking the Good Samaritan: Communists, Capitalists and the Duty to Rescue*, 1976 Utah Law Review 529.

[10] Jeffers, *Those Good Samaritan Laws: Are They Really Necessary?*, Med. Econ., July 27, 1964, a la pág. 106.

[11] *Good Samaritan Statutes: Adrenalin for the "Good Samaritan"*, 13 DePaul Law Review 297 (1963-64).

[12] Note, *Good Samaritans and Liability for Medical Malpractice*, 64 Columbia Law Review 1301 (1964).

responsabilidad civil cuando ocasionen perjuicios a las personas asistidas.

Sección 2.-  ...

Sección 3.-  Esta exoneración sólo será aplicable cuando los actos u omisiones realizados por las personas referidas en esta ley no sean constitutivos de negligencia crasa, o con el propósito de causar daño." (Enfasis suplido.)

Al aprobar la citada Ley Núm. 139, el legislador excluyó de responsabilidad civil por daños y perjuicios a los médicos, entre otros profesionales[13], si se cumplen los requisitos establecidos por la misma, a saber:

(A) Estar legalmente autorizado a ejercer la profesión médica en Puerto Rico;

(B) Actuar fuera del curso y del sitio regular de su empleo o práctica profesional;

(C) Actuar voluntariamente;

(D) Actuar gratuitamente;

(E) Que se trate de una emergencia médica; y que

(F) La acción u omisión no sea constitutiva de negligencia crasa ni con el propósito de causar daño.

III

No hay duda alguna de que en el presente caso se cumple con el primero de los requisitos que exige nuestra "Ley del Buen Samaritano"; esto es, el recurrido Dr. Montilla es un facultativo médico autorizado a ejercer la profesión

---

[13] La Sección 1 de la referida Ley también excluye de responsabilidad a las enfermeras, a los técnicos de emergencias médicas, al igual que a los voluntarios de la Cruz Roja Americana, Defensa Civil y Cuerpo de Voluntarios en Acción que estén debidamente acreditados, por tales cuerpos. La Sección 2, también excluye de responsabilidad a los policías, bomberos, o personal de ambulancia que se desempeñen como tales y que hayan aprobado algún curso de primeros auxilios por la Cruz Roja Americana, por la Sociedad Americana del Corazón o por cualquier otra institución debidamente acreditada.

médica en Puerto Rico. Así surge de la deposición que fuera tomada el día 18 de julio de 1990. Ese hecho no ha sido negado ni refutado por la parte demandante en ninguna etapa de los procedimientos.

De la misma manera, el requisito de que se trate de una emergencia médica no está en controversia. Ninguna de las partes sostiene que lo acontecido en la sala de operaciones "C" del Hospital San Jorge no fuera una emergencia médica, e incluso, según la transcripción de la deposición tomada el día 22 de junio de 1992 al perito de la parte demandante, Dr. Hernández Cibes, así se acepta.

Ahora bien, un análisis cuidadoso del expediente revela que en el presente caso es necesario recibir evidencia, en vista plenaria, respecto a los cuatro restantes requisitos que impone dicha Ley, a saber: que el Dr. Montilla haya actuado "fuera del curso y del sitio regular de su empleo o práctica profesional"; que haya actuado voluntariamente; que haya actuado gratuitamente; y que la acción u omisión no fuera constitutiva de negligencia crasa ni con el propósito de causar daño. Veamos.

Consideramos, en primer término, el requisito de "actuar fuera del curso y del sitio regular de su empleo o práctica profesional". Una interpretación razonable de nuestro estatuto, en específico, de la intención legislativa y de la razón de ser del mismo, nos lleva a concluir que el sitio preciso, o lugar, donde se presta la ayuda de emergencia no

tiene un peso, ni constituye un factor, determinante en la decisión de si la Ley Núm. 139 cobija, o no, al facultativo médico. Lo verdaderamente importante es que se trate de una emergencia médica y que el médico que presta la ayuda no tenga un deber preexistente de actuar hacia la persona que recibe la misma. En otras palabras, somos del criterio que el facultativo médico puede cumplir con el requisito en cuestión si demuestra que no existía una relación preexistente que le imponía la obligación de intervenir, ya sea en el caso de ser un médico empleado, en virtud de su contrato de trabajo, o si se desenvuelve en la práctica privada, por no existir una *relación médico paciente* con la persona intervenida.[14] Esto último es, que la persona intervenida no era parte de su práctica profesional.

Esta interpretación que hacemos de nuestro estatuto adelanta el propósito perseguido por el legislador al aprobar el mismo, puesto que las personas cubiertas por el estatuto no tendrán el temor de ser demandados civilmente por los servicios de emergencias que presten, independientemente del

---

[14]    En términos generales, existe una relación médico-paciente cuando éste último, con el único fin de obtener tratamiento médico, o un diagnóstico preliminar a dicho tratamiento, consulta a un médico o se somete a un examen por este. Claro está, es necesario que el médico realice diagnóstico o provea tratamiento a ese paciente; esto es, que lo haya aceptado como su paciente. [L]a relación médico--paciente constituye "un acto de confianza para las dos partes; principalmente, desde el ángulo del paciente que elige al médico". Colón Prieto v. Geigel, 115 D.P.R. 232 (1984) (Citas omitidas). Como tal, el paciente debe entregar el cuidado de su salud--diagnóstico, intervención quirúrgica o tratamiento posterior--al médico descansando en su buena

lugar o sitio en que presten los mismos; ello con el consiguiente beneficio para nuestra ciudadanía en general. Al así actuar, no hacemos otra cosa que acoger la interpretación generalizada en las jurisdicciones estatales norteamericanas.

Con ello en mente, examinamos el presente caso con el propósito de poder concluir si existe, en esta etapa de los procedimientos, prueba que sostenga la determinación de que el Dr. Montilla cumple con el requisito antes mencionado. El Dr. Montilla, a nuestro juicio, cumpliría con el mismo si se demuestra que, a la fecha de la intervención con la paciente, él no tenía una relación médico-paciente con la Sra. Meléndez de Elías, o, si no existía una relación contractual, o de otra índole, entre el doctor y el Hospital San Jorge en virtud de la cual él viniera obligado a prestar ayuda a la paciente.

Parece ser un hecho incontrovertido que, previo a la intervención con la Sra. Meléndez de Elías, no existía relación alguna médico-paciente entre la referida dama y el Dr. Montilla.[15] Ahora bien, en la demanda que radicaron los demandantes, éstos alegaron que el Dr. Montilla, además de ser miembro de la facultad activa del Hospital San Jorge, era el jefe del Departamento de Ginecología y Obstetricia del referido hospital y, por lo tanto, empleado del mismo. Con relación a ello, el tribunal de instancia se limitó a

---

fe, capacidad y opinión.
[15]  Esto es un hecho que ha sido aceptado por la parte demandante a través de todo el proceso judicial.

determinar, en la sentencia sumaria que emitiera, que para la fecha del 18 de julio de 1990 --fecha de la deposición del Dr. Montilla-- el referido galeno formaba parte de la facultad activa del Hospital San Jorge.

En cuanto a la responsabilidad civil que pueda tener el Dr. Montilla, no consideramos determinante si la relación del doctor con el Hospital San Jorge era en calidad de jefe de algún departamento o como miembro de la facultad activa del Hospital, sino el contenido y significado de dicha relación.[16]

Si el Dr. Montilla, en efecto, era el jefe de algún departamento del Hospital, el tribunal de instancia debe analizar el contrato que mediaba entre las partes a la fecha de la intervención para analizar los términos del mismo. ¿Qué deberes y obligaciones legales tenía el Dr. Montilla para con

---

[16] Veáse, a modo de derecho comparado, McKenna v. Cedars of Lebanon Hospital, Inc., 93 Cal App. 282 (1979), en donde el tribunal aplicó el estatuto del Buen Samaritano y concedió inmunidad civil a un jefe de residentes que estaba de turno y fue llamado para atender una emergencia. El tribunal le concedió la inmunidad porque el doctor no estaba de guardia para atender emergencias sino que estaba de guardia como jefe de residencia, no era miembro del equipo encargado de atender emergencias en el hospital y no tenía una relación médico-paciente con el enfermo. Concluyó el tribunal que el médico era un voluntario que atendió el llamado de un compañero médico para ayudarlo con un paciente. Es decir, concluyó que se encontraba fuera del curso regular de sus obligaciones.

El estatuto en cuestión rezaba de la siguiente manera:

"No person licensed under this chapter, who in good faith renders emergency care at the scene of an emergency, shall be liable for any civil damages as a result of any acts or omissions by such person in rendering such emergency care." (Business and

el Hospital? ¿Venía obligado el doctor a atender los pacientes del Hospital en situaciones de emergencia, o se limitaba dicho contrato a labores administrativas? ¿Recibía el Dr. Montilla remuneración por dicha labor? Este es el tipo de interrogantes que deben ser dilucidadas en una vista plenaria.

Por otro lado, pero de la misma manera, si el Dr. Montilla era solamente parte de la facultad activa del Hospital San Jorge se tienen que contestar varias interrogantes. ¿Qué conllevaba ser parte de la facultad activa de dicho Hospital? ¿Qué tipo de servicios proveen los médicos de la facultad activa a cambio del privilegio que le concede el Hospital de utilizar sus facilidades? ¿Requiere el hospital que su facultad atienda las emergencias de sus pacientes? ¿De dónde surgen estas obligaciones? ¿Hay algún contrato o reglamento del Hospital que les imponga dicha obligación?

Como vemos, la determinación de si el Dr. Montilla actuaba "fuera del curso [...] regular de su empleo" depende, en gran medida, de la contestación a estas interrogantes. Como no sabemos si, en efecto, hay un contrato de empleo o alguna obligación contractual que convirtiera la intervención quirúrgica que realizó en parte de su trabajo, no tenemos los elementos de juicio necesarios para determinar en definitiva

Professional Code § 2144).

si el Dr. Montilla actuaba "fuera del curso y del sitio de su empleo".

En cuanto al tercer y cuarto requisito de Ley, esto es, actuar de forma "voluntaria y gratuitamente", el análisis es idéntico, por lo tanto, igual conclusión resulta procedente. Nadie actúa, desde el punto de vista de la "Ley del Buen Samaritano", de manera voluntaria cuando el facultativo médico viene obligado contractualmente a atender las emergencias médicas que se susciten en los predios de un hospital. Por otro lado, y en cuanto al requisito de actuar gratuitamente, ambas partes están contestes en que el Dr. Montilla no cobró honorarios a la parte demandante por su intervención. Ahora bien, esto no necesariamente significa que haya actuado gratuitamente, ya que si mediara algún contrato entre el hospital y el médico, y éste recibía remuneración en virtud del mismo, no habría actuado gratuitamente.

En resumen, en esta etapa de los procedimientos este foro judicial no tiene los elementos de juicio necesarios para decidir qué tipo de relación profesional existía entre el Dr. Montilla y el Hospital San Jorge para la fecha de la intervención quirúrgica de la Sra. Meléndez de Elías, lo cual es materia de evidencia a ser presentada en una vista plenaria. Ello impide que se pueda decidir, en esta etapa de los procedimientos, si la "Ley del Buen Samaritano" es aplicable o no al presente caso.

IV

Existe un fundamento adicional para devolver el caso al foro de instancia para la celebración de vista plenaria. Nos referimos a la determinación respecto al requisito de que la acción u omisión del médico "no sea constitutiva de negligencia crasa ni con el propósito de causar daño". Este Tribunal ha definido el concepto de negligencia crasa como la falta completa de cuidado, o ejercicio de un grado tan pequeño de diligencia que justifique la creencia de que hay una completa indiferencia respecto del interés y bienestar de los demás.[17] La parte demandante alegó que el Dr. Montilla fue crasamente negligente al extirpar y/o ligar la ruptura del quiste ovárico.[18] El tribunal de instancia determinó, mediante sentencia sumaria parcial, que en la intervención del Dr. Montilla con la paciente no medió negligencia crasa, como tampoco ánimo de causar daño. El foro de instancia llegó a dicha conclusión sin celebrar vista en su fondo, en la cual la parte demandante tuviera la oportunidad de presentar prueba acreditativa de la alegada negligencia crasa.

Reiteradamente hemos indicado que el mecanismo de sentencia sumaria no es el apropiado para resolver casos en

---

[17] Pueblo v. Telmaín Escalera, 45 D.P.R. 447,453 (1933).

[18] El área de especialización del médico debe ser uno de los elementos a considerarse al determinar si existió o no negligencia crasa. No hay duda de que a un médico que interviene con un paciente en un área de su especialidad puede y debe exigírsele un nivel de conocimiento y destreza mayor que a un médico que interviene en una emergencia que

donde hay elementos subjetivos, de intención, propósitos mentales o negligencia o cuando el factor de credibilidad sea esencial. Soto v. Hotel Caribe Hilton, Opinión y Sentencia de 17 de octubre de 1994. De la misma manera, también hemos dicho que "hay litigios y controversias que por la naturaleza de los mismos no hacen deseable o aconsejable el resolverlos mediante una sentencia sumariamente dictada, porque difícilmente en tales casos el Tribunal puede reunir ante sí toda la verdad de los hechos a través de declaraciones de autenticidad o deposiciones." García López v. Méndez García, 88 D.P.R. 363,379 (1963).

V

En este caso debemos dar su día en corte a la parte demandante para que así ésta tenga la oportunidad de demostrar, si es que puede hacerlo mediante preponderancia de la prueba, que el Dr. Montilla tenía el deber preexistente de actuar y/o incurrió en negligencia crasa.

En vista de todo lo anterior, concluimos que el tribunal de instancia erró al determinar, mediante sentencia sumaria parcial, que el Dr. Montilla es acreedor a la inmunidad estatutaria concedídale por la Ley Núm. 139 de 3 de junio de 1976; ello en vista de que existe controversia en cuanto a aspectos esenciales del caso. Cuadrado Lugo v. Santiago Rodríguez, 126 D.P.R. 272 (1990). En consecuencia, se dictará

está fuera del ámbito de su especialidad.

Sentencia revocatoria, devolviéndose el caso al foro de instancia para procedimientos ulteriores consistentes con lo aquí expresado y resuelto.



                        FRANCISCO REBOLLO LÓPEZ
                            Juez Asociado

**EN EL TRIBUNAL SUPREMO DE PUERTO RICO**

José Manuel Elías Vega y otros

    Demandantes-recurrentes

           v.                    RE-94-366        REVISIÓN

Paul C. Chenet y otros

    Demandados-recurridos

SENTENCIA

San Juan, Puerto Rico, a 16 de febrero de 1999

        Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia revocatoria de la emitida por el tribunal de instancia y se devuelve el caso a dicho foro para procedimientos ulteriores consistentes con lo aquí expresado y resuelto.

        Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Naveira de Rodón no interviene. El Juez Asociado señor Fuster Berlingeri inhibido. El Juez Asociado señor Corrada del Río no intervino.

                Isabel Llomapart Zeno
           Secretaria del Tribunal Supremo