Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IV

| JANNETTE TORRES SANTIAGO<br><br>Apelante<br><br>v.<br><br>JANNSEN ORTHO LLC, CT CORPORATION SYSTEM<br><br>Apelado | TA2025AP00317 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Arecibo<br><br>Caso Núm.: AR2024CV02495<br><br>Sobre: Despido Injustificado; Discrimen por Edad; Procedimiento Sumario |

Panel integrado por su presidenta, la Jueza Ortiz Flores, el Juez Bonilla Ortiz y la Jueza Martínez Cordero.

*Martínez Cordero, jueza ponente*

**SENTENCIA**

En San Juan, Puerto Rico, a 9 de octubre de 2025.

Comparece Jannette Torres Santiago (en adelante, señora Torres Santiago o apelante) mediante un *Recurso de Apelación,* para solicitarnos la revisión de la *Sentencia,* emitida y notificada el 26 de agosto de 2025, por el Tribunal de Primera Instancia, Sala Superior de Arecibo.[1] Mediante la *Sentencia* apelada, el foro primario declaró *Ha Lugar* una solicitud de sentencia sumaria presentada por la parte apelada del título, y *No Ha Lugar* aquella presentada por la apelante.

Por los fundamentos que expondremos, se *confirma* la *Sentencia* apelada.

I

El caso del título tuvo sus inicios cuando, el 26 de diciembre de 2024, la señora Torres Santiago presentó una *Querella,* al amparo

---

[1] Sistema Unificado de Manejo y Administración de Casos (SUMAC TPI), a la Entrada Núm. 30.

de la Ley de Procedimiento Sumario de Reclamaciones Laborales,[2] sobre despedido injustificado, discrimen por edad y daños, contra Janssen Ortho, LLC (en adelante, Janssen o parte apelada).[3] En el pliego, relató que comenzó a trabajar para Janssen en el año 1998, como representante de ventas. Alegó que laboró en la referida compañía por espacio aproximado de veintisiete (27) años, ocupando puestos en diversas divisiones de Janssen. Esbozó que dichos puestos ocupados, no alteraron la naturaleza de sus funciones de ventas. Acentuó que, durante el mes de noviembre del año 2024, participó de una reunión en la cual se anunció la eliminación de la División de Cardiovascular y Metabólica (CVM), a la cual ella estaba adscrita, y que, como resultado del cierre de esa división, su puesto de representante de ventas sería eliminado. Según alegó, por lo anterior, fue cesanteada de su empleo, efectivo el 31 de enero de 2025.

Dicho lo anterior, la apelante destacó en su *Querella* que Janssen le realizó una oferta de pago a cambio de que firmara un Acuerdo de Separación y Relevo General (Acuerdo) de cualquier reclamación que pudiera tener en contra de su patrono. Empero, la apelante optó por acudir al foro judicial. Lo anterior, puesto a que entendió que Janssen, para ejecutar la eliminación de la fuerza de venta adscrita a CVM, implantó una reducción en la fuerza laboral la cual era contraria a la legislación aplicable, por lo que su despido constituyó fue injustificado y discriminatorio por razón de edad. Lo anterior, ya que, según esbozado la aludida reducción de fuerza laboral tuvo un impacto dispar y perjudicial hacia los empleados de mayor edad.

Por otra parte, la señora Torres Santiago arguyó en su petitorio que Janssen, al momento de despedirla, no tomó en

---

[2] Ley Núm. 2 de 17 de octubre de 1961, 32 LPRA sec. 3118 *et seq.*
[3] SUMAC TPI, a la Entrada Núm. 1.

consideración que ella era la empleada de la fuerza de ventas con más antigüedad. Subrayó que la referida compañía, cuando implantó la antes mencionada reducción en fuerza laboral, utilizó como criterio exclusivo los puestos de venta de CVM, empero, debió haberla comparado con aquellos que ocupaban puestos en clasificación similares en las otras divisiones de Janssen que subsistieron, específicamente, en las que ella había laborado anteriormente, y que estaba capacitada para realizar las funciones. Señaló que la gran mayoría de las plazas de venta que subsistieron en las otras divisiones estaban ocupadas por empleados con menor antigüedad. Así, pues, la señora Torres Santiago planteó que fue despedida en violación a la Ley Antidiscrimen de Puerto Rico (Ley Núm. 100).[4] A tenor, indicó que, en virtud de la Ley Sobre Despidos Injustificados (Ley Núm. 80),[5] tenía derecho a una indemnización equivalente a seis (6) meses y setenta y ocho (78) semanas de su compensación más alta durante los últimos tres (3) años de empleo con Janssen, la cual ascendía a $305,905.56 dólares. Por otro lado, alegó que los daños sufridos, a consecuencia de las actuaciones discriminatorias en su contra, se estimaban en una cantidad no menor de $500,000.00 dólares. A su vez, reclamó tener derecho a que se le pagara por los honorarios de sus abogados a razón del 25%.

En repuesta, el 14 de enero de 2025, Janssen presentó una *Contestación a Querella*.[6] Esencialmente, negó algunas de las alegaciones contenidas en la *Querella* y admitió otras. Conjuntamente, alegó que la razón por la cual la división de CMV fue eliminada se debió a un plan de reorganización, toda vez que a nivel corporativo se decidió que Puerto Rico debía de alinearse con

---

[4] Ley Núm. 100 de 30 de junio de 1959, 29 LPRA sec. 146 *et seq.*
[5] Ley Núm. 80 de 30 de mayo de 1976, 29 LPRA sec. 185a *et seq.*
[6] SUMAC TPI, a la Entrada Núm. 6.

las estrategias de negocios a nivel de los Estados Unidos. Subrayó que el referido plan de reorganización consistió en un proceso de reducción de fuerza laboral, mediante el cual se eliminaron todos los puestos bajo CVM y se cesanteó a la totalidad de esos empleados, incluyendo a la señora Torres Santiago. Establecido lo anterior, arguyó que el referido plan de organización fue ejecutado por razones legítimas de negocios y conforme a la legislación laboral aplicable, de manera que, el despido de la aquí apelante fue por justa causa y sin ánimo discriminatorio alguno.

Por otro lado, Janssen planteó que, dado que todos los empleados de CVM fueron cesanteados, la antigüedad de la señora Torres Santiago no fue un factor que tenía que ser considerado, ya que no subsistieron puestos vacantes dentro de la misma clasificación ocupacional que fueran desempeñados por empleados con menos años de servicio que ella. Como corolario de lo anterior, destacó que, aunque subsistieron puestos de venta en otras divisiones en las cuales se había desempeñado la apelante, cada división de ventas es ocupacionalmente distinta y separada, con su propia estructura directiva, gerencial y de supervisión.

De otra parte, Janssen acentuó en su contestación que, de buena fe y sin estar obligado a ello, le extendió la fecha de cesantía a la señora Torres Santiago al 31 de enero de 2025, a los fines de que esta pudiese cumplir con el periodo aplicable para ser acreedora de los beneficios de retiro de la compañía. Igualmente, subrayó que a esta se le extendió un paquete de separación, sujeto a la firma de un Acuerdo, el cual incluía un pago voluntario y otros beneficios a ser provistos por la compañía en apoyo a la apelante.

Por último, Janssen manifestó que, dado a que el despido de la señora Torres Santiago se efectuó conforme a la legislación aplicable, esta no tenía derecho a la mesada que dispone la Ley

Núm. 80,[7] así como tampoco a la concesión de una cuantía por daños, ya que su despido fue por justa causa y sin mediar discrimen alguno. Asimismo, razonó que la apelante no tenía derecho a recobrar los gastos, costas ni honorarios de abogados incurridos en el litigio.

Tras varias instancias procesales innecesarias pormenorizar, el 22 de mayo de 2025, Janssen incoó una *Moción de sentencia sumaria*.[8] En el escrito, planteó que, en este caso, no existían hechos materiales y esenciales en controversia que impidieran la resolución del pleito por la vía sumaria. Arguyó que lo único que estaba en controversia en cuanto a la reclamación de despido injustificado era un asunto de estricto derecho, el cual era si, conforme a la Ley Núm. 80, se debió tomar en consideración todas la divisiones comerciales y empleados de venta a la hora de aplicar las reglas sobre retención por antigüedad las cuales dispone la referida ley.

Sobre el aludido asunto en controversia, Janssen adujo que, según admitido por la señora Torres Santiago en su deposición, la estructura organizacional de Janssen, en lo que respecta la promoción y venta de productos farmacéuticos o medicamentos para consumo humano, está fragmentada en divisiones comerciales que responden a la especialidad o subespecialidad de productos a promocionarse y venderse. Por tanto, acotó que lo que los vendedores de cada división en particular se dedican exclusivamente a promocionar productos de esa área. Indicó que, por lo anterior, las clasificaciones ocupacionales de la compañía estaban divididas primero por división comercial y luego por

---

[7] 29 LPRA sec. 185a *et seq.*

[8] SUMAC TPI, a la Entrada Núm. 20. Para sustentar su petitorio sumario la parte apelante anejó los documentos siguientes: Anejo 1: Transcripción de la deposición de la señora Torres Santiago y exhibits del 11 de marzo de 2023; Anejo 2: Transcripción de la deposición de la señora Sandra Marrero Olivo (señora Marrero Olivo), Gerente de Recursos Humanos de Janssen, y exhibits del 19 de marzo de 2025; Anejo 3: Declaración jurada de la señora Marrero Olivo del 22 de mayo de 2025 (veintitrés (23) exhibits); Anejo 4: Resumé de la señora Torres Santiago.

experiencia, así como que cada división tiene su propia fuerza de ventas, estructura gerencial, presupuestos, certificaciones y estrategias.

Establecido lo anterior, Janssen arguyó en su petitorio sumario que, dado a que la clasificación ocupacional de ventas de la señora Torres Santiago estaba ubicada específicamente en CVM y esta fue eliminada, no podía pretender que la ubicaran por razón de su antigüedad, en otra división comercial, dado a que esto era inconsistente con la prerrogativa comercial de la compañía la cual era mantener sus divisiones separadas. Así, pues, entre otras cosas, Janssen arguyó que quedó demostrado que se cumplió a cabalidad con los requisitos de retención por antigüedad dispuestos por la Ley Núm. 80. Ello, puesto a que, por razón de haberse eliminado todas las plazas de CVM, en virtud de una reorganización legítima, no había que cumplir con la referida retención por antigüedad, ya que no quedó ningún empleado en la división. Igualmente adujo que quedó demostrado que, este caso, no era uno de discrimen por edad, dado que no se estaba ante un escenario en el cual se retuvo a los empleados más jóvenes ya que, en efecto, ningún empleado de CVM fue retenido.

De otra parte, Janssen puntualizó que, aunque surgía que luego del cierre de CVM se abrieron seis (6) plazas nuevas, la querellante admitió que estas no se relacionaban a funciones de venta y que no solicitó para las mismas, de modo que, en el caso de marras, tampoco cabía hablar de reempleo preferente, ni se podía concluir que mediante tales plazas se retuvieron a los empleados más jóvenes, ya que se demostró que hubo personas tanto mayores como menores que la apelante, que permanecieron trabajando en esas posiciones. Al amparo de lo expuesto, Janssen solicitó que se declara con lugar su moción y que se dictara sentencia sumaria desestimando la totalidad del pleito con perjuicio.

En reacción, el 12 de junio de 2025, la señora Torres Santiago presentó una *Moción de sentencia sumaria a favor de la querellante y oposición a solicitud de la querellada.*[9] A través de este petitorio, solicitó que se denegara la solicitud de sentencia sumaria presentada por Janssen y, en la alternativa, se dictara sentencia sumaria a su favor en cuanto su reclamación de despido injustificado, así como para adjudicarle a dicha compañía responsabilidad bajo la Ley Núm. 100,[10] por haberse probado que este caso era uno *prima facie* de discrimen por edad. Planteó que los hechos materiales e incontrovertidos propuestos por Janssen justificaban el resultado opuesto al cual fue sugerido. En específico, destacó que la prueba en autos estableció como un hecho incontrovertido que ella era la representante de ventas con mayor antigüedad, así como que subsistieron puestos dentro de esa clasificación ocupacional, por lo que su empleo nunca debió interrumpirse. Sobre este particular, igualmente subrayó que Janssen no presentó ningún tipo de prueba tendente a demostrar que ella era exclusivamente vendedora de CVM, como tampoco para demostrar que en Janssen la clasificación ocupacional del puesto estaba definida por la división. Por lo anterior, planteó que lo que realmente reveló la prueba producida por Janssen fue que no existe una clasificación ocupacional de representante de ventas para cada división, sino una sola a la cual pertenecen todos los puestos de representantes de venta.

Establecido lo anterior, la señora Torres Santiago adujo en su moción que las razones articuladas por Janssen para la terminación

---

[9] SUMAC TPI, a la Entrada Núm. 24. La señora Torres Santiago acompañó su moción en oposición y en solicitud de sentencia sumaria a su favor con los documentos siguientes: Anejo A: Transcripción de la deposición de la señora Torres Santiago del 11 de marzo de 2023; Anejo B: Transcripción de la deposición de la señora Marrero Olivo del 19 de marzo de 2025; Anejo C: Declaración jurada de la señora Marrero Olivo del 22 de mayo de 2025; Anejo D: Evaluaciones y desglose de compensaciones otorgadas a la señora Marrero Olivo en Janssen; Anejo E: Comprobante de Retención de la señora Marrero Olivo del año 2022.
[10] 29 LPRA sec. 146 *et seq.*

de su empleo tenían el propósito de ocultar la verdadera intención de sus actuaciones, cual era discriminarla por razón de edad. Indicó que, fortalecía su posición sobre el ánimo discriminatorio de la compañía el hecho de que Janssen publicó la disponibilidad de una plaza de representante de ventas en la división de inmunología, pero no se la ofreció. Por otro lado, manifestó que ameritaba determinar que Janssen había procedido de manera temeraria. Ello, puesto a que había alargado el pleito al insistir en una teoría a sabiendas de que no existía prueba para establecer su defensa.

Evaluados los mencionados escritos, así como una réplica presenta por parte de Janssen,[11] el 26 de agosto de 2025, el tribunal de instancia emitió la *Sentencia* que nos ocupa.[12] Mediante el referido dictamen, declaró *Ha Lugar* la solicitud de sentencia sumaria presentada por Janssen y *No Ha Lugar* aquella presentada por la señora Torres Santiago.

Del referido dictamen, surgen las siguientes setenta y seis (76) determinaciones de hecho:

1. Janssen es una compañía dentro de la familia de compañías de Johnson & Johnson que se dedica, entre otras cosas, a la manufactura, promoción y venta de productos farmacéuticos o medicamentos para consumo humano.
2. Los productos farmacéuticos manufacturados por Janssen están bajo un área de la Compañía conocida como Innovative Medicine y atienden diversas áreas terapéuticas, por lo que se comercializan o venden a través de lo que se conoce como Janssen Comercial, que a su vez contiene distintas divisiones comerciales o de ventas divididas por área terapéutica.
3. Además de las divisiones comerciales o de venta, Janssen Comercial incluye otras áreas de apoyo conocidas como Strategic Customer Group, Commercial Excellence, Business Excellence, Patient Engagement and Customer Satisfaction y comunicaciones.
4. "Área terapéutica", "franquicia" o "división", son términos que significan lo mismo desde el punto de vista de la estructura del área comercial y ventas de Janssen.
5. La industria farmacéutica en la que opera Janssen es una altamente regulada por diversas dependencias

---

[11] SUMAC TPI, a la Entrada Núm. 28. A través de escrito, Janssen se opuso a la solicitud de sentencia sumaria presentada por la señora Torres Santiago.
[12] SUMAC TPI, a la Entrada Núm. 30.

gubernamentales, incluyendo la agencia federal conocida como el Food and Drug Administration ("FDA").

6. Al 13 de noviembre de 2024, Janssen contaba con las siguientes divisiones comerciales: CVM, Oncología, Inmunología, Enfermedades Infecciosas y Neurociencia.

7. Los representantes de ventas de Janssen están asignados a una franquicia o división comercial en particular, en atención a los productos farmacéuticos que se comercializan bajo dicha división comercial o franquicia.

8. Cada franquicia o división comercial estaba dirigida por un Business Unit Director, quienes a su vez reportaban al Gerente General de Janssen Comercial en Puerto Rico, el Sr. José Castellote ("Castellote"), mientras que Castellote se reportaba al Presidente de Innovative Medicine Norteamérica Comercial.

9. Cada división de Janssen tiene sus propios representantes de ventas, quienes se reportan a un Regional Sales Manager dentro de su división dependiendo de los productos y territorios asignados, y estos a su vez su vez (sic) se reportan a un Business Unit Director dentro de su división.

10. Los roles de venta de Janssen también se dividen por nivel de experiencia, que incluyen de menor a mayor experiencia, los puestos de Professional Sales Representative (Representante de Ventas Profesional), Senior Sales Representative (Representante de Ventas Senior) y Executive Sales Representative (Representante de Ventas Ejecutivo). Janssen utiliza la misma descripción del Puesto para todos sus representantes de Ventas Ejecutivos, irrespectivo del área terapéutica o división a la que estén asignados. Las funciones esenciales de todos los Sales Representative son similares.

11. A mayor nivel el puesto, mayor la responsabilidad que tiene el representante de ventas y se le exigen otros requisitos—como funciones de coaching o mentoría—además de las gestiones de ventas relacionadas a la franquicia a la que pertenecen y el territorio particular asignado. En cuanto al coaching o mentoría, esta función solo es realizada por los Seniors y los Executive.

12. Los representantes de ventas comercializan individualmente los productos de la división comercial a la que pertenecen en su territorio asignado y son responsables de manejar su presupuesto, mantener el control de muestras y realizar actividades para la promoción de los productos.

13. Los representantes de ventas de Janssen deben tomar adiestramientos y obtener certificaciones, los cuales varían dependiendo de los productos a promocionar y la división comercial bajo los cuales ubican, por lo que éstos son adiestrados y certificados en los productos que van a vender en sus respectivas franquicias, lo cual además es un requisito para poder salir a vender y mercadear esos productos.

14. Aunque se utilizan las mismas descripciones de deberes de los roles de venta en todas las divisiones comerciales, una vez la persona es asignada a una franquicia en particular, se le requiere que tome los adiestramientos y

obtenga las certificaciones requeridas para comercializar los productos bajo esa franquicia.

15. Es importante que los representantes de venta de Janssen conozcan el territorio asignado dentro de su división, ya que es importante saber hacia dónde ir, quiénes son los clientes, dónde están los más importantes y hacer relaciones con estos.

16. Las condiciones de mercado son distintas por cada división comercial, por lo que las estrategias que funcionan en una división no necesariamente funcionan en otra.

17. El periodo de adiestramientos, certificaciones y familiarización con el territorio asignado de un representante de ventas tiene una duración de varios meses y conlleva un impacto financiero en las ventas de los productos de la división comercial a la cual pertenece el empleado.

18. Para el éxito de una división comercial, es importante que sus profesionales de venta desarrollen y cultiven relaciones con los facultativos y profesionales de la salud que prescriben los medicamentos bajo esa división.

19. Cada división comercial de Janssen tiene su propio presupuesto y plan de mercado, que responden a las necesidades particulares de cada área terapéutica y se ven impactados por el ciclo de vida del producto.

20. Cada gerente o Business Unit Director de cada división comercial es responsable de las evaluaciones de desempeño de sus empleados, las cuales son documentadas a través del sistema electrónico conocido como Workday.

21. Al menos desde el año 2019, de surgir una vacante de representante de ventas en alguna de las divisiones comerciales de Janssen, el puesto vacante se publica y los empleados interesados tienen que solicitar al puesto dentro de esa división comercial y pasar por un proceso de entrevistas, previo a la selección del candidato para el puesto vacante.

22. Torres comenzó a trabajar para Janssen el 9 de febrero de 1998, como representante de ventas en la división comercial de Janssen conocida entonces como Primary Care.

23. Al comenzar a trabajar en Janssen, Torres recibió adiestramientos sobre los productos que iba a promocionar bajo la división de Primary Care, así como de los temas de salud asociados a tales productos.

24. Las funciones de Torres como representante de ventas de Primary Care incluían visitar médicos, promocionar los productos asignados, tener un control de muestras, asegurar que las muestras estuvieran guardadas en un lugar apropiado, manejar de manera apropiada, manejar un presupuesto, hacer y organizar actividades con médicos de promoción de los productos, presentar planes de acción y de mercadeo, entre otras.

25. Antes de salir a promocionar los productos bajo la franquicia de Primary Care, Torres tenía que completar los programas de certificación sobre los productos.

26. Algunos de los productos que Torres promocionaba como representante de ventas en el área de Primary Care se

utilizaban para tratar infecciones por hongos, Alzheimer, dolor crónico y reflujo estomacal, tales como Propulsid, Sporanox, Nizoral, Reminyl, Duragesic y Aciphex.

27. Torres promocionaba los productos de la división de Primary Care en un territorio específico.

28. En o alrededor de mayo de 2003, Torres pasó a la franquicia de Janssen que se conocía entonces como Central Nervous System ("CNS").

29. Al cambiar de la división de Primary Care a la división comercial de CNS, Torres tuvo que adiestrarse, completar un programa de certificaciones y certificarse para vender los productos bajo la división de CNS, lo cual tomó varias semanas divididas entre su hogar y en los Estados Unidos.

30. Como representante de ventas de la división de CNS, los esfuerzos de venta de Torres iban dirigidos exclusivamente a neurólogos, psiquiatras, instituciones psiquiátricas y hospitales, vendiendo medicamentos para tratar condiciones como esquizofrenia y bipolaridad.

31. Mientras que en la división de Primary Care, Torres visitaba a los médicos asociados a los productos, o a las indicaciones terapéuticas de los productos que se vendían en esa franquicia, en CNS visitaba a otro tipo de médicos que están bajo esa otra área terapéutica.

32. Entre los productos que Torres promocionaba como representante de ventas del área de CNS estaban Risperdal, Invega y Concerta, para tratar condiciones de trastorno bipolar y esquizofrenia, así como déficit de atención e hiperactividad.

33. En el año 2008, Torres fue promovida al puesto de Supervisora de Ventas dentro de la división comercial de CNS, pero en el 2010 solicitó dejar de ser supervisora, por motivos personales, y regresó a un puesto de representante de ventas en la misma división comercial.

34. Luego de estar aproximadamente diez (10) años en la división comercial de CNS, Torres pasó a la división de enfermedades infecciosas y virología de Janssen, conocida en inglés como Infectious Diseases ("ID").

35. Al cambiar a la división de ID, Torres tuvo que adiestrarse y certificarse para poder vender y mercadear los productos bajo dicha división.

36. Las funciones de Torres como representante de ventas en la división comercial de ID estaban enfocadas en medicamentos para tratar el Síndrome de Inmunodeficiencia Adquirida ("VIH") y dirigidas a hospitales y centros de salud que atendían pacientes con VIH, así como médicos, enfermeros, trabajadores sociales y entidades gubernamentales, entre otras, que atendían a esta población.

37. Entre los productos que Torres promocionaba como representante de ventas en la división de ID para tratar el VIH se encontraban Prezista, Intelence, Edurant, Complera y Prezcobix.

38. En el 2018, Torres pasó a la división de CVM de Janssen como Representante de Ventas Ejecutiva.

39. Como parte de la transición a la división de CVM, Torres tuvo que tomar adiestramientos y completar programas de certificaciones en los productos de CVM, así como

familiarizarse con las enfermedades asociadas a las indicaciones de tales productos.

40. Las funciones de Torres como representante de ventas en la división de CVM eran similares a las que tenía anteriormente en ID, CNS y Primary Care, pero los productos que promocionaba, Invokana y Xarelto, eran para tratar condiciones cardiovasculares y metabólicas, por lo que los esfuerzos de promoción iban dirigidos a médicos primarios, internistas, cardiólogos, endocrinólogos y nefrólogos.

41. A la fecha de la reorganización y RIF, Torres se reportaba al Sr. José A. González Malavé, Regional Sales Manager de CVM, quien a su vez se reportaba al Sr. José Coriano, Business Unit Director de CVM ("Coriano"), mientras que Coriano reportaba al Gerente General Comercial, Castellote.

42. Torres fue adiestrada y certificada para todas las posiciones que tuvo con Janssen en las distintas divisiones comerciales, lo cual era requerido como condición para que ella pudiera salir a mercadear y vender esos productos.

43. Los adiestramientos y certificaciones que Torres tomó en las distintas divisiones comerciales de Janssen variaban dependiendo de los productos y la franquicia bajo la cual ubicaban.

44. El 24 de septiembre de 2024, Torres y los demás empleados del área comercial de Janssen fueron citados a una reunión a celebrarse el día siguiente.

45. El 25 de septiembre de 2024, Torres participó en una reunión liderada por Castellote, junto a los demás vendedores, gerentes y directores de todas las divisiones comerciales de Janssen en Puerto Rico, donde se informó sobre el cierre de la división de CVM a nivel de los Estados Unidos, ya que los productos bajo CVM iban a pasar a otra división de Janssen conocida como Established Products Group y el negocio se iba a estar enfocando en las divisiones comerciales de Oncología, Inmunología y Neurociencia, y algunas áreas particulares como Hipertensión Pulmonar.

46. El cierre de la división de CVM a nivel de los Estados Unidos resultó en la eliminación de todos los puestos en el área comercial, que sumaban setecientos sesenta y tres (763), de los cuales seiscientos sesenta y uno (661) estaban ocupados, además de la eliminación y cesantía de otros puestos que no estaban relacionados a ventas dentro de la estructura general de CVM en Estados Unidos.

47. En la reunión de 25 de septiembre de 2024, Castellote informó que, conforme a la información que tenía hasta ese momento, entendía que Puerto Rico no iba a ser impactado por el cierre de CVM a nivel de Estados Unidos.

48. A principios del mes de octubre de 2024, la organización de Janssen a nivel de los Estados Unidos tomó la determinación de que Puerto Rico también habría de ser impactado por el cierre de CVM, lo cual activó un proceso de reorganización e implementación de una reducción de

personal relacionado al cierre de la división comercial de CVM en Puerto Rico.

49. El 12 de noviembre de 2024, Torres y el resto de la división comercial de CVM recibieron una invitación para una reunión al día siguiente.

50. El 13 de noviembre de 2024, Torres participó de una reunión virtual dirigida por Coriano, Business Unit Director de CVM, donde se informó que el cierre de la división comercial de CVM en los Estados Unidos también iba a impactar las operaciones en Puerto Rico, por lo que todos los empleados de ventas de dicha división iban a ser cesanteados.

51. En la reunión de 13 de noviembre de 2024, Coriano explicó que el cierre de la división de CVM a nivel de los Estados Unidos y Puerto Rico responde a que el medicamento conocido como Xarelto—que siempre fue considerado como el producto estrella de CVM—ya no requiere una fuerza de ventas dedicada a su promoción y mercadeo debido a la etapa del ciclo de vida del producto, por lo que Xarelto y demás productos bajo la división comercial de CVM serían transferidos a una división de Janssen en los Estados Unidos conocida como Established Products Group que se encarga de apoyar productos que ya están establecidos en el mercado, motivo por el cual las estrategias de la Compañía iban a estar enfocadas en las divisiones comerciales de Oncología, Inmunología y Neurociencia.

52. La decisión de cerrar CVM en todo Estados Unidos y Puerto Rico fue tomada a nivel corporativo en los Estados Unidos.

53. Como parte de la reunión del 13 de noviembre de 2024, se les explicó a los empleados de ventas de CVM que su último día de empleo sería el 13 de diciembre de 2024 y que no era necesario que se reportasen a trabajar hasta esa fecha, para que se pudiesen enfocar en su transición y próximos pasos.

54. Además, en la reunión de 13 de noviembre de 2024, los empleados fueron orientados en cuanto a que existían otras oportunidades en las empresas de la familia de compañías de Johnson & Johnson y los alentaron a que solicitaran a esas posiciones, incluyendo seis (6) nuevas posiciones que se iban a estar abriendo en el área comercial de Janssen en Puerto Rico.

55. El 13 de noviembre de 2024, además de la reunión principal junto a los demás empleados de ventas de CVM, Torres también tuvo una reunión individual con la Sra. Sandra Marrero Olivo, Líder de Recursos Humanos de Janssen para el área comercial ("Marrero"), cuyo enfoque era hablarle de los beneficios de separación que provee la Compañía.

56. Como parte de la reunión individual, Marrero le informó a Torres que contrario a los demás compañeros cesanteados, su salida de la Compañía iba a ser efectiva el 31 de enero de 2025 a modo de excepción, a los fines de que Torres pudiese cumplir cincuenta y cinco (55) años de edad mientras aún estaba empleada por Janssen, lo cual era necesario para alcanzar el mínimo de edad requerido para cualificar para el beneficio de plan

médico de retirados y los beneficios de pensión, además del mínimo de diez (10) años de servicio en la Compañía que ya había cumplido.

57. El cierre de la división de CVM en Puerto Rico resultó en la cesantía de todos los empleados de ventas bajo dicha división comercial.

58. Todos los empleados de ventas bajo la división de CVM fueron cesanteados efectivo el 13 de diciembre de 2024, con excepción de Torres que fue cesanteada el 31 de enero de 2025.

59. Luego de llevar a cabo los análisis correspondientes y determinar el impacto del RIF y las cesantías tras el cierre de la división de CVM en Puerto Rico, Janssen postergó la fecha de terminación de Torres al 31 de enero de 2025, con el propósito de que esta pudiera cumplir cincuenta y cinco (55) años de edad mientras estaba empleada por la Compañía, necesarios para cualificar para los beneficios de retiro bajo el plan de pensión de la Compañía, incluyendo participar del plan médico para pensionados.

60. La cesantía de Torres fue efectiva el 31 de enero de 2025.

61. A la fecha en que Janssen notificó el cierre de CVM en Puerto Rico y la consecuente reorganización y RIF, Torres tenía cincuenta y cuatro (54) años de edad.

62. Como parte del proceso de reorganización que incluyó el cierre total y permanente de la división comercial de CVM en Puerto Rico, se eliminaron todas las plazas de ventas bajo dicha división, que incluían un total de quince (15) puestos, de los cuales trece (13) estaban ocupados al momento de implementar el RIF.

63. Los trece (13) empleados que ocupaban puestos de ventas en la división de CVM en Puerto Rico fueron cesanteados tras la eliminación de la división de CVM, incluyendo sus plazas de ventas.

64. Entre los trece (13) representantes de ventas de CVM que fueron cesanteados en Puerto Rico tras la reorganización y RIF figuraban empleados tanto mayores como menores que la Querellante, cuyas edades fluctuaban entre veintisiete (27) y cincuenta y siete (57) años.

65. En cuanto a los otros Representantes de Ventas Ejecutivos de otras divisiones comerciales y que permanecieron trabajando en dichas otras divisiones de Janssen figuraban empleados tanto mayores como menores que la Querellante, cuyas edades fluctuaban entre cuarenta y un (41) y sesenta y un (61) años.

66. Entre los Representantes de Ventas Senior adscritos a las otras divisiones comerciales de Janssen y que permanecieron en su empleo figuraban empleados tanto mayores como menores que la Querellante, cuyas edades fluctuaban entre treinta y dos (32) y cincuenta y seis (56) años.

67. No había Representantes de Ventas Profesionales adscritos a otras divisiones comerciales de Janssen ajenas a CVM.

68. Janssen abrió seis (6) plazas internamente de forma contemporánea con el proceso de reorganización y RIF que impactó a la división de CVM y sus empleados de venta, cuyas clasificaciones ocupacionales eran: (a) Hematology Product Manager; (b) Immunology Product

Manager; (c) Marketing Specialist, Oncology; (d) Oncology Clinical Educator; (e) Pharmacy Solutions Senior Specialist; y (f) Regional Manager, Field Reimbursement.

69. Ninguna de las seis (6) plazas estaba bajo la clasificación ocupacional de Representantes de Ventas Ejecutiva de CVM, ni ninguna otra clasificación ocupacional relacionada a ventas.

70. A pesar de que fue orientada y exhortada a solicitar, Torres no solicitó a ninguna de las seis (6) posiciones que fueron abiertas por Janssen luego de que se le informara sobre el cierre de la división de CVM en Puerto Rico y la cesantía de todos los empleados de venta de dicha división.

71. A pesar de que fue orientada y exhortada a solicitar, Torres tampoco solicitó para alguna otra plaza dentro de la familia de compañías de Johnson & Johnson.

72. A pesar de que fue orientada sobre ello, Torres tampoco se registró para recibir el beneficio de continuar el acceso a información sobre puestos vacantes en la compañía por el término de un (1) año luego de su separación, así como tampoco utilizó los servicios de transición de carrera provistos por la compañía y otros beneficios relacionados y que formaban parte del paquete de separación.

73. Varios empleados de Janssen solicitaron a los seis (6) puestos vacantes, incluyendo algunos de los empleados que fueron cesanteados junto a Torres.

74. Cuatro (4) de los empleados cesanteados junto a Torres fueron reclutados para las plazas nuevas, luego de solicitar y pasar por el proceso de reclutamiento de las mismas, incluyendo a José A. González Malavé, de cuarenta y nueve (49) años, para el puesto de Regional Manager, Field Reimbursement; Juan A. Vega Miranda, de cuarenta y ocho (48) años, para el puesto de Hematology Product Manager; David Guerra García, de veintisiete (27) años, para el puesto de Marketing Specialist, Oncology, y Erica Rivera Ramos, de cuarenta y cinco (45) años, como Oncology Clinical Educator.

75. Los otros dos (2) empleados que fueron reclutados para las nuevas plazas son Vivian Vázquez, de cuarenta y seis (46) años, para el puesto de Immunology Product Manager, y Jannette Ortiz Ponce, de cincuenta y siete (57) años, para el puesto de Pharmacy Solutions Senior Specialist.

76. La única convocatoria de empleo relacionada a ventas que ha sido publicada por Janssen luego del 13 de noviembre de 2025 y hasta la fecha de hoy, fue una plaza gerencial titulada Senior Regional Sales Manager, Immunology, la cual fue cancelada durante el mes de marzo de 2025 sin contratar a nadie.[13]

En mérito de las referidas determinaciones de hecho, el foro de instancia concluyó que, aunque las clasificaciones ocupacionales de los representantes de venta de Janssen son muy similares entre sí,

---

[13] SUMAC TPI, a la Entrada Núm. 30, págs. 3-15.

estas se encontraban limitadas a cada división de negocio. En otras palabras, que los representantes de ventas de CVM se encontraban en la misma clasificación ocupacional dentro de la división, pero no compartían la mima clasificación ocupacional de otro representante de venta en otras divisiones de Janssen. Por lo anterior, el foro primario razonó que Janssen no venía obligada a tomar en consideración los años de servicios de los representantes de las otras divisiones a la hora de determinar la antigüedad de los representantes de venta de CVM. Entiéndase que, Janssen no tenía que realizar ese ejercicio, puesto a que todos los empleados de CVM fueron cesanteados. Por otro lado, el referido foro subrayó que, dado a que el despido de la señora Torres Santiago estuvo justificado, no procedía alegación alguna en cuanto a discrimen por edad.

En desacuerdo con el curso decisorio, el 5 de septiembre de 2025, la señora Torres Santiago acudió ante esta Curia mediante el presente recurso de apelación, en el cual esgrimió los siguientes señalamientos de error:

A. Erró el Tribunal de Primera Instancia al tan siquiera considerar si Janssen incumplió con su obligación bajo el Artículo 3 de la Ley 80-1976 o discriminó por razón de edad en violación a la Ley 100-1959, cuando no reempleó a Torres en el puesto de Vendedora Ejecutiva en la División de Inmunología, publicado en abril de 2025.

B. Erró el Tribunal de Primera Instancia cuando desestimó la reclamación de despido injustificado, obviando el análisis requerido por *Díaz Fontánez v. Wyndham Hotel Corp.,* 155 D.P.R. 345 (2001) y descartando la prueba incontrovertida que Janssen, en el ejercicio de su prerrogativa gerencial, agrupó a todos los Representantes de Venta en la misma clasificación ocupacional, sin especificación de la división a la que estaba asignada la empleada, lo que la obligaba a preferir a Torres porque era la Representante de Ventas con mayor antigüedad en la compañía.

C. Asumiendo que ya sea el despido o la negativa de reemplear a Torres fuese sin justa causa, erró el Tribunal de Primera Instancia al no dictar sentencia sumaria en la reclamación de discrimen por edad porque Torres satisface el caso *prima facie* bajo *McDonnell Douglas v. Green,* 411 U.S. 792 (1973) y la compañía no puede utilizar el cierre de operaciones y la reorganización como

> defensa y, sin ella, carece de una razón no discriminatoria para rebatir la presunción de que las acciones adversas de empleo que tomó en contra de Torres no las hubiese tomado a no ser por su edad y procede dictar sentencia a su favor.

El 1 de octubre de 2025, compareció la parte apelada mediante *Alegato en oposición a apelación*. Con el beneficio de la comparecencia de las partes, procederemos a resolver el presente recurso.

II

### A. La Sentencia Sumaria

El mecanismo procesal de sentencia sumaria es un remedio discrecional extraordinario que, únicamente, se concederá cuando la evidencia que se presente con la moción establezca con claridad la existencia de un derecho.[14] El propósito de este mecanismo procesal es facilitar la solución justa, rápida y económica de los litigios civiles que no presenten controversias genuinas de hechos materiales, razón por la cual no ameritan la celebración de un juicio en su fondo.[15] A esos efectos, "solamente debe ser dictada una sentencia sumaria en casos claros, cuando el Tribunal tenga ante sí la verdad sobre todos los hechos pertinentes".[16] Es decir, para que proceda dictar sentencia por la vía sumaria, es imprescindible que de los documentos que acompañan la solicitud o que obran en el expediente del tribunal no surja controversia legítima sobre hechos materiales del caso, y que, por ende, sólo reste aplicar el derecho.[17] Ahora bien, a los fines de considerar la moción, se tendrán como ciertos todos los hechos no controvertidos que consten en los documentos y declaraciones juradas ofrecidas por la parte

---

[14] *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 DPR 881, 911 (1994).
[15] *García Rivera et al. v. Enríquez*, 153 DPR 323, 337 (2001); *Pilot Life Ins. Co. v. Crespo Martínez*, 136 DPR 624, 632 (1994).
[16] *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, supra, a las págs. 911-912, citando a *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 DPR 714, 721 (1986) (Cita depurada); *Cuadrado Lugo v. Santiago Rodríguez*, 126 DPR 272, 279 (1990).
[17] *Nissen Holland v. Genthaller*, 172 DPR 503, 511 (2007).

promovente.[18] No obstante, tales documentos deben evaluarse de la forma más favorable para la parte que se opone a la moción.[19]

La Regla 36 de Procedimiento Civil regula todo lo concerniente a las solicitudes de sentencia sumaria. En específico, la Regla 36.2 de Procedimiento Civil dispone que:

> Una parte contra la cual se haya formulado una reclamación podrá, a partir de la fecha en que fue emplazada pero no más tarde de los treinta (30) días siguientes a la fecha límite establecida por el tribunal para concluir el descubrimiento de prueba, presentar una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación.[20]

Por otra parte, la Regla 36.3 de Procedimiento Civil requiere que la parte que promueve la solicitud de sentencia sumaria cumpla con los requisitos de forma siguientes:

> (1) una exposición breve de las alegaciones de las partes;
>
> (2) los asuntos litigiosos o en controversia;
>
> (3) la causa de acción sobre la cual se solicita la sentencia sumaria;
>
> (4) una relación concisa, organizada y con párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, indicando los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;
>
> (5) las razones por las cuales se debe dictar sentencia argumentando el derecho aplicable, y
>
> (6) el remedio que debe ser concedido.[21]

De otra parte, en cuanto a la contestación a la sentencia sumaria, la Regla 36.3 (b) de Procedimiento Civil dispone que esta deberá ser presentada dentro del término de veinte (20) días, desde su notificación, y deberá contener lo siguiente:

> (1) lo indicado en los subincisos (1), (2) y (3) del inciso anterior;

---

[18] *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, 133 DPR 945, 957 (1993).
[19] *Íd.*
[20] 32 LPRA Ap. V, R. 36.2.
[21] *Íd.*, R. 36.3.

(2) una relación concisa y organizada, con una referencia a los párrafos enumerados por la parte promovente, de los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;

(3) una enumeración de los hechos que no están en controversia, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;

(4) las razones por las cuales no debe ser dictada la sentencia, argumentando el derecho aplicable.[22]

Cumplidos los requisitos establecidos para la solicitud de sentencia sumaria y su correspondiente oposición, el inciso (e) de la Regla 36.3 de Procedimiento Civil establece que:

La sentencia solicitada será dictada inmediatamente si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que, como cuestión de derecho, el tribunal debe dictar sentencia sumaria a favor de la parte promovente.[23]

No obstante, lo anterior, el solo hecho de no presentar evidencia que controvierta lo presentado por la parte promovente no implica necesariamente que proceda la sentencia sumaria.[24] Sobre este particular, el Tribunal Supremo ha resuelto que las partes no pueden descansar en aseveraciones generales, es decir, meras afirmaciones no bastan.[25] A esos efectos, y a tenor con la Regla 36.5 de Procedimiento Civil,[26] estarán obligadas a demostrar que tienen

---

[22] 32 LPRA Ap. V, R. 36.3 (b).
[23] *Íd.*, R. 36.3 (e); *García Rivera et al. v. Enríquez*, supra, a la pág. 338; *Roldán Flores v. M. Cuebas,* 199 DPR 664, 676 (2018); *Lugo Montalvo v. Sol Meliá Vacation*, 194 DPR 209, 225 (2015).
[24] *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, supra, a la pág. 913; *García Rivera et al. v. Enríquez*, supra, a la pág. 338; *Consejo Tit. C. Parkside v. MGIC Fin. Corp.*, 128 DPR 538, 549 (1991); *Cuadrado Lugo v. Santiago Rodríguez*, 126 DPR 272, 281 (1990).
[25] *Flores v. Municipio de Caguas,* 114 DPR 521, 525 (1983); *Ramos Pérez v. Univisión*, 178 DPR 200, 215-216 (2010).
[26] 32 LPRA Ap. V, R. 36.5.

evidencia para sustanciar sus alegaciones.[27] Por tanto, como regla general, para derrotar una solicitud de sentencia sumaria, la parte opositora deberá presentar contradeclaraciones juradas y contradocumentos que pongan en controversia los hechos presentados por el promovente.[28]

Por otra parte, es menester subrayar que nuestro Tribunal Supremo ha indicado que el mecanismo de sentencia sumaria no es el apropiado para resolver casos en los cuales hay elementos subjetivos, de intención, propósitos mentales o negligencia, o cuando el factor de credibilidad sea esencial.[29] De la misma manera, también ha razonado que "hay litigios y controversias que por la naturaleza de estos no hacen deseable o aconsejable el resolverlos mediante una sentencia sumariamente dictada, porque difícilmente en tales casos el Tribunal puede reunir ante sí toda la verdad de los hechos a través de 'affidavits' o deposiciones".[30]

En cuanto al proceso de revisión de las sentencias sumarias, nuestro Alto Foro ha sido enfático en que el Tribunal de Apelaciones debe:

> (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario;
>
> (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36;
>
> (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y
>
> (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el

---

[27] *Flores v. Municipio de Caguas*, supra, a la pág. 525; *Ramos Pérez v. Univisión*, supra, a las págs. 215-216.

[28] *Ramos Pérez v. Univisión*, supra, a la pág. 215; *Roldán Flores v. M. Cuebas*, supra, a la pág. 677.

[29] *Elías y otros v. Chenet y otros*, 147 DPR 507, 521 (1999); *Soto v. Hotel Caribe Hilton*, 137 DPR 294, 301 (1994); *Velázquez Ortiz v. Mun. de Humacao*, 197 DPR 656, 663 (2017).

[30] *Elías y otros v. Chenet y otros*, supra, a la pág. 521, citando a *García López v. Méndez García*, 88 DPR 363, 380 (1963).

Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.[31]

Ahora bien, la sentencia sumaria no procederá en las instancias que: (i) existan hechos materiales y esenciales controvertidos; (ii) haya alegaciones afirmativas en la demanda que no han sido refutadas; (iii) surja de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial, o (iv) como cuestión de derecho, no proceda.[32] Además, al revisar la determinación del foro primario, respecto a una sentencia sumaria, estamos limitados de dos (2) maneras. *Primero,* solo podemos considerar los documentos que se presentaron ante el foro de primera instancia. Es decir, "las partes no pueden añadir en apelación exhibits, deposiciones o affidávits que no fueron presentados oportunamente en el foro de primera instancia, ni pueden, por primera vez ante el foro apelativo, esbozar teorías nuevas o esgrimir asuntos nuevos".[33] *Segundo*, solo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta.[34] Entiéndase, que al foro apelativo le es vedado adjudicar los hechos materiales esenciales en disputa, ya que dicha tarea le corresponde al foro de primera instancia.[35]

## B. La Ley Núm. 80 Sobre Despido Injustificado

El despido se ha definido como "la ruptura unilateral, que hace el patrono, del contrato individual de trabajo celebrado con uno o varios trabajadores".[36] Sabido es que esta ruptura contractual, puede conllevar, en numerosas ocasiones, a la pérdida del único medio para obtener los artículos y servicios necesarios para vivir.[37]

---

[31] *Roldán Flores v. M. Cuebas, et al., supra,* a la pág. 679. (Cita depurada); *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 118-119 (2015).
[32] *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310, 335-336 (2021).
[33] *Meléndez González et al. v. M. Cuebas, supra*, a la pág. 114. (Cita depurada).
[34] *Íd.*, a la pág. 115.
[35] *Vera v. Dr. Bravo*, 161 DPR 308, 335 (2004).
[36] *Díaz v. Wyndham Hotel Corp.*, 155 DPR 364, 374 (2001).
[37] *Íd.*

En consecuencia de lo anterior, se ha establecido como interés apremiante del Estado el regular las relaciones obrero-patronales.[38] A esos fines, se aprobó la Ley Núm. 80, para proteger, de una forma más efectiva, los derechos de los obreros puertorriqueños, otorgar unos remedios más justicieros y desalentar la incidencia del despido injustificado.[39] Entiéndase que, nuestro ordenamiento jurídico no prohíbe el despido de un empleado, si no que busca la protección de los derechos de los trabajadores, para, así, establecer un balance entre las relaciones obrero-patronales.[40]

A tales efectos, la Ley Núm. 80 dispone que todo empleado de comercio, industria o cualquier otro negocio o sitio de empleo, el cual trabaje mediante remuneración de alguna clase, contratado sin tiempo determinado y que fuere despedido de su cargo sin justa causa, tendrá derecho a recibir de su patrono: (i) una cantidad equivalente a tres (3) meses de sueldo por concepto de indemnización, siempre y cuando haya culminado el periodo probatorio aplicable, según se dispone en esta Ley, o el periodo probatorio distinto que las partes hayan estipulado, y (ii) una cantidad equivalente a dos (2) semanas de sueldo por cada año completo de servicio.[41]

Cabe resaltar que el referido estatuto no define lo que constituye un despido injustificado.[42] Ahora bien, sí establece que "[s]e entenderá por justa causa para el despido aquella que no esté motivada por razones legalmente prohibidas y que no sean producto del mero capricho del patrono".[43] En específico, menciona (6) razones que se entenderán por justa causa, siempre que afecten el

---

[38] *Díaz v. Wyndham Hotel Corp.*, supra, a la pág. 374.
[39] Exposición de motivos de la Ley Núm. 80*, supra.*
[40] *Segarra Rivera v. Int'l Shipping et al.*, 208 DPR 964, 982 (2022).
[41] Artículo 1 de la Ley Núm. 80, *supra*, 29 LPRA sec. 185a.
[42] *Segarra Rivera v. Int'l Shipping et al.*, supra, a la pág. 983.
[43] Artículo 2 de la Ley Núm. 80, *supra,* 29 LPRA sec. 185b.

buen y normal funcionamiento de un establecimiento.[44] Entre estas se encuentran las siguientes:

> [. . .].

> (d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.

> (e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

> (f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.[45]

Es de ver que las referidas circunstancias son escenarios de índole económica que puede enfrentar la operación diaria de una empresa.[46] En otras palabras, "situaciones que no son imputables al obrero pero son de tal naturaleza que su despido resulta prácticamente inevitable dentro de las normas usuales y ordinarias que imperan en el manejo de los negocios".[47]  Se ha entendido, pues, que las empresas tienen la potestad de despedir a sus empleados cuando enfrenten cualesquiera de ellas.[48] Sin embargo, la Ley Núm. 80 exige que, si el despido está basado en alguno de los tres (3) mencionados escenarios, el patrono retenga con preferencia a los empleados con más antigüedad "siempre que subsistan puestos vacantes u ocupados por empleados de menos antigüedad en el empleo dentro de su clasificación ocupacional que puedan ser desempeñados por ellos [. . .]".[49] Igualmente, si dentro de los seis (6) meses de efectuado el despido, la empresa adviene en la necesidad

---

[44] Artículo 2 de la Ley Núm. 80, *supra.*
[45] *Íd.*
[46] *Segarra Rivera v. Int'l Shipping et al.*, supra, a la pág. 984.
[47] *Reyes Sánchez v. Eaton Electrical*, 189 DPR 586, 598 (2013), citando al *Informe Conjunto de las Comisiones de Trabajo y Derechos Civiles y Servicio Público*, P. de la C. 1112, 23 de abril de 1975, a la pág. 3. (Cita depurada).
[48] *Segarra Rivera v. Int'l Shipping et al.*, supra, a la pág. 984.
[49] Artículo 3 de la Ley Núm. 80, *supra,* 29 LPRA sec. 185c.

de emplear a una persona con labores iguales o similares a las que desempeñaba el despedido en el momento de su cesantía, debe de contratar con preferencia a la persona recién despedida.[50] Para lo anterior, la empresa deberá tomar en consideración la clasificación ocupacional del empleado despedido, así como su orden de antigüedad.[51]

Por otra parte, el Artículo 3-A de la Ley Núm. 80 especifica que, cuando el patrono tiene varias oficinas, fábricas, sucursales o plantas en Puerto Rico, los criterios antes mencionados se aplicarán únicamente dentro de cada establecimiento físico impactado por la reducción de persona.[52] Ahora bien, cuando se prueba que "durante el año inmediatamente previo: (1) los empleados de las clasificaciones ocupacionales afectadas usual y frecuentemente se trasladaban de un establecimiento a otro; y (2) los empleados estaban bajo supervisión directa común en la administración diaria del personal", entonces "se deberá comparar a los empleados de los establecimientos así integrados".[53] En otras palabras, para que una empresa con distintos establecimientos, divisiones o franquicias, como la que es objeto de este caso, compute la antigüedad de sus empleados solamente en el establecimiento en el cual se efectúa la reducción de personal, esta debe establecer que no existen traslados frecuentes de empleado, así como deberá demostrar que sus establecimientos operan de forma independiente en cuanto a los aspectos de personal, como son las cuestiones reclutamiento, despido y retención de empleados.[54] En cuanto a este particular, nuestro Tribunal Supremo expreso que:

> De esta forma, el legislador limitó las circunstancias en que, para efectos de establecer el orden de retención de empleados por antigüedad, se tenga que considerar a todos los empleados de los distintos establecimientos de la empresa en

---

[50] Artículo 3 de la Ley Núm. 80, *supra.*
[51] *Íd.*
[52] *Íd.,* Artículo 3-A, 29 LPRA sec. 185c.
[53] *Íd.*
[54] *Reyes Sánchez v. Eaton Electrical,* supra, a la pág. 604.

la clasificación ocupacional en que se llevará a cabo una reducción de personal. Esto sin afectar el derecho de retención preferente por antigüedad de aquellos empleados que laboran en empresas entre cuyos distintos establecimientos en Puerto Rico se realizan traslados frecuentes o que operan de forma sustancialmente integrada en cuanto a los aspectos de personal.[55]

Respecto a las clasificaciones ocupacionales, la hoy derogada *Guía Revisada para la Interpretación y Aplicación de la Ley Núm. 80*, disponía que cuando surgieran controversias con relación a este particular se debían considerar los siguientes criterios: "(i) las funciones y los deberes del puesto; (ii) los requisitos para ocupar la plaza, incluyendo los conocimientos y las destrezas necesarias, así como la preparación académica; (iii) forma de compensación, y (iv) forma en que se realiza el trabajo".[56]

Por otro lado, en lo referente a la reorganización empresarial, se ha razonado que esta debe ser *bona fide* y no producto del mero capricho del patrono.[57] Entiéndase que, el despido del empleado se deba a que la empresa optó por modificar su forma de hacer negocios, mediante cambios encaminados a optimizar sus recursos y aumentar sus ganancias, como lo son la eliminación de plazas, creando otras nuevas o funcionando algunas ya existentes, como vehículo para enfrentar sus problemas financieros o de competitividad.[58] Ahora bien, para demostrar que la reorganización constituyó justa causa para el despido, el patrono deberá "presentar evidencia acreditativa del plan de reorganización implantado, así como su utilidad".[59] Asimismo, se ha establecido que el patrono que pretenda justificar el despido por disminución de ganancias "debe

---

[55] *Reyes Sánchez v. Eaton Electrical*, supra, a las págs. 604-605.
[56] Véase nota al calce núm. 12 de *Díaz v. Wyndham Hotel Corp.*, supra, citando a la *Guía Revisada para la Interpretación y Aplicación de la Ley Núm. 80* del Departamento del Trabajo y Recursos Humanos del Gobierno de Puerto Rico, 1996, pág. 39. Conviene mencionar que esta guía fue sustituida por las *Guías para la Interpretación de la Legislación Laboral de Puerto Rico* del Departamento del Trabajo y Recursos Humanos, (1era ed. 2019).
[57] *Segarra Rivera v. Int'l Shipping et al.*, supra, a la pág. 985.
[58] *Íd.,* a la pág. 985.
[59] *Íd.*, a la pág. 986, citando a *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 427 (2013).

presentar evidencia que acredite la alegada disminución en la producción, ventas o ganancias".[60] Además, deberá establecer un nexo causal entre la disminución económica de la empresa y la razón del despido.[61] Lo anterior, dado a que se ha entendido que la disminución en producción únicamente será justa causa para un despido cuando "sea una sustancial al punto que atente contra la continuidad de la empresa".[62]

Lo anterior, responde a que la Ley Núm. 80 "invierte el orden de la prueba en casos civiles y le impone al patrono el deber de probar *in limine* que el despedido fue justificado".[63] Sin embargo, para que el empleado goce de la referida presunción, debe demostrar que: (i) fue contratado por un comercio, industria u otro negocio; (ii) su contrato era por tiempo indeterminado; (iii) recibía una remuneración por su trabajo, y (iv) fue despedido.[64]

### C. El Discrimen por Edad

Es norma harta conocida que nuestra Constitución establece una prohibición sobre el discrimen de raza, color, sexo, nacimiento, origen, condición social e ideas políticas o religiosas.[65] En virtud de ello, se ha reconocido que "la inviolabilidad de la dignidad del ser humano es el principio cardinal sobre el cual se cimentan los derechos fundamentales de toda persona".[66] En consideración a lo anterior, se promulgó la Ley Antidiscrimen de Puerto Rico (Ley Núm. 100), la cual "implanta la política constitucional y establece responsabilidad civil y criminal contra los patronos que discriminen en el reclutamiento, en los términos y condiciones de empleo, y despidan de tal manera a algún empleado suyo, legitimando al

---

[60] *Segarra Rivera v. Int'l Shipping et al.*, supra, a la pág. 986, citando a *SLG Zapata-Rivera v. J.F. Montalvo*, supra, a la pág. 426. (Cita depurada).
[61] *Segarra Rivera v. Int'l Shipping et al.*, supra, a la pág. 986.
[62] *Íd.*, a la pág. 986, citando a *SLG Zapata-Rivera v. J.F. Montalvo*, supra, a la pág. 426.
[63] *Ortiz Ortiz v. Medtronic*, 209 DPR 759 (2022), citando a *Romero et als. v. Cabrer Roig et als.*, 191 DPR 643, 652 (2014). (Énfasis omitido).
[64] *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894, 907 (2011).
[65] Artículo II, Sección 8, Const. ELA [Const. PR], LPRA, Tomo 1, ed. 2016.
[66] *Segarra Rivera v. Int'l Shipping et al,* supra, a la pág. 987.

empleado discriminado a entablar una causa de acción en daños y perjuicios".[67]

En el año en que se promulgó el referido cuerpo normativo, las estadísticas demostraban que las restricciones relacionadas a la edad estaban siendo aplicadas por los patronos en el 58% de los empleos, así como que se reveló que tan solo 22% de las personas aceptadas en el empleo eran mayores de cuarenta y cinco (45) años de edad.[68] A tenor, se entendió prudente incluir entre las áreas protegidas por la ley el que una persona sea privada de oportunidad de empleo por razón de su edad.[69] Siendo así, todo patrono que incurra en dicha prohibición será responsable civilmente, así como podría ser convicto de delito menos grave.[70]

Pese a que en un principio se pretendió proteger contra el discrimen a las personas de edad avanzada, luego de una serie de enmiendas, se dispuso que la edad contra la cual se prohíbe discriminar es desde la edad mínima en que legalmente se permite trabajar en adelante.[71] Entiéndase, que "no hay un límite específico de edad protegida para un empleado poder entablar su reclamación al amparo de la Ley Núm. 100".[72]

En lo pertinente al caso de marras, es menester destacar que, en aquellos casos en los cuales el empleado inste simultáneamente una acción al amparo de la Ley Núm. 80, así como de la Ley Núm. 100, debe alegar en su demanda que su despido fue injustificado y luego, proceder a establecer que su caso es uno *prima facie* de discrimen.[73] Para cumplir con lo anterior, el empleado deberá demostrar que: (1) fue despedido; (2) sin justa causa, y (3) que está

---

[67] *Díaz v. Wyndham Hotel Corp.*, supra, a la pág. 381.
[68] Exposición de Motivos de la Ley Núm. 100, *supra.*
[69] *Íd.*, Artículo 1, 29 LPRA sec. 146.
[70] *Íd.*
[71] *Díaz v. Wyndham Hotel Corp.*, supra, a la pág. 380. Véase, además, Artículo 6 de la Ley Núm. 100, *supra*, LPRA sec. 151.
[72] *Díaz v. Wyndham Hotel Corp.*, supra, a la pág. 380. (Cita depurada).
[73] *López Fantauzzi v. 100% Natural*, 181 DPR 92, 124 (2011).

ubicado dentro de la modalidad de discrimen bajo la cual reclama.[74] Otras cuestiones que se podrán evidenciar para lograr establecer la presunción de discrimen son que el empleado estaba cualificado para el trabajo y que el patrono buscó remplazarlo con otro con cualificaciones similares.[75]

Establecido lo anterior, se activará una presunción de que el empleado fue despedido sin justa causa.[76] Sin embargo, la referida presunción puede ser derrotada por el patrono de tres (3) formas: "(1) derrotar el hecho básico —la ausencia de justa causa— (2) destruir el hecho presumido —que el despido fue por causa de motivos discriminatorios— o (3) destruir el hecho básico y el presumido a la vez".[77] Sobre este particular, nuestro Tribunal Supremo ha razonado que, para rebatir la presunción, basta con que el patrono pruebe que la razón para el despido no fue discriminatoria.[78] En otras palabras, "no se requiere que el patrono convenza al juzgador de que la razón proferida constituye la verdadera causa o, en estricto derecho, una justa causa para el despido, sino que meramente la evidencia debe ser lo suficientemente clara y específica para sostener que el motivo determinante no fue discriminatorio".[79]

Derrotada la presunción de discrimen, el empleado no tendrá otro remedio que, mediante preponderancia de prueba, demostrar la existencia de discrimen intencional, sin contar con la presunción.[80] Lo anterior, podrá lograrlo directamente, persuadiendo al juzgador que, con gran probabilidad hubo motivo discriminatorio, o indirectamente, exhibiendo que la explicación

---

[74] *López Fantauzzi v. 100% Natural*, supra, a la pág. 124.
[75] *Jiménez Soto y otros v. Carolina Catering Corp. y otros*, 2025 TSPR 3, pág. 24, 215 DPR ___ (2025).
[76] *López Fantauzzi v. 100% Natural*, supra, a la pág. 124.
[77] *Íd.*
[78] *Segarra Rivera v. Int'l Shipping et al,* supra, a la pág. 990.
[79] *Jiménez Soto y otros v. Carolina Catering Corp. y otros*, supra, a la pág. 26.
[80] *Segarra Rivera v. Int'l Shipping et al,* supra, a la pág. 990.

ofrecida por el patrono no es creíble.[81] Ahora bien, si el patrono evidencia que despidió al patrono mediando justa causa, no puede ser responsable de discrimen al amparo de la Ley Núm. 100.[82]

## III

En el caso del título, el foro de instancia emitió un dictamen mediante el cual desestimó por la vía sumaria la *Querella* por despido injustificado y discrimen presentada por la apelante.

Conforme se desprende de la relación de hechos antes esgrimida, la señora Torres Santiago fue despedida de la compañía apelada, luego de haber laborado en esta como representante de ventas por el espacio aproximado de veintisiete (27) años. Según alegó la apelante, en el mes de noviembre de 2024, se le informó que, como resultado del cierre de CVM, es decir, la división a la cual ella estaba adscrita, su puesto de representante de ventas sería eliminado. En consecuencia, esta fue cesanteada de su empleo, efectivo el 31 de enero de 2025, razón por la cual incoó la acción del título. Conviene mencionar que, ninguna de las partes ha presentado controversia en cuanto a que el motivo del despido de la apelante fue el cierre de la aludida división.

En el recurso ante nos, en apretado resumen, la apelante esgrimió tres (3) errores presuntamente cometidos por el tribunal de primera instancia. En estos, la apelante muestra su inconformidad con el foro primario tras haber desestimado sumariamente su caso, así como que plantea que su despido fue injustificado. Ello, puesto a que Janssen no podía utilizar el cierre de operaciones y la reorganización operacional como defensa. Adujo que las acciones tomadas en su contra fueron exclusivamente por su edad.

Por otro lado, plantea que el tribunal de instancia erró en su proceder, dado a que Janssen violentó las disposiciones del Artículo

---

[81] *Jiménez Soto y otros v. Carolina Catering Corp. y otros*, supra, a la pág. 26.
[82] *Mestres Dosal v. Dosal Escandón*, 173 DPR 62, 73 (2008).

3 de la Ley Núm. 80 al no reemplear a la apelante en otra división de la compañía.[83] Además, sostiene que también incidió el Tribunal al obviar prueba incontrovertida que demostraba que Janssen agrupó a todos los representantes de venta en la misma clasificación ocupacional, sin especificar la división a la que estaban asignados. Por estar estos errores íntimamente relacionados, los atenderemos de forma conjunta.

En primer lugar, puntualizamos que, en el presente caso, ambas partes presentaron solicitudes de sentencia sumaria y las correspondientes oposiciones. Evaluados dichos petitorios, el foro *a quo* declaró *Ha Lugar* la solicitud de sentencia sumaria presentada por la parte apelada del título, y *No Ha Lugar* la presentada por la apelante. Sabido es que, como paso previo para determinar si procedía declarar con lugar una solicitud de sentencia sumaria, esta Curia debe examinar *de novo* dicha solicitud, así como el pliego en oposición, y evaluar el cumplimiento de ambos escritos con la Regla 36 de Procedimiento Civil.[84] Luego de revisar los autos del presente caso, se desprende que ambas partes del título, al instar sus solicitudes de sentencia sumaria, cumplieron sustancialmente con los requisitos exigidos por la Regla 36.2 de Procedimiento Civil.[85] Ahora bien, de un examen minucioso de la *Moción de sentencia sumaria a favor de la querellante y oposición a solicitud de la querellada* incoada por la señora Torres Santiago, coincidimos en que esta no logró controvertir lo alegado y fundamentado por la parte apelada en su solicitud de sentencia sumaria. Veamos.

Según reseñamos en nuestra exposición doctrinal, cuando como en el caso de autos, se presenta simultáneamente una acción al amparo de la Ley Núm. 80, así como de la Ley Núm. 100, el

---

[83] 29 LPRA sec.185c.
[84] *Roldán Flores v. M. Cuebas, et al., supra,* a la pág. 679; *Meléndez González et al. v. M. Cuebas,* supra, a las págs. 118-119.
[85] 32 LPRA Ap. V, R. 36.2.

empleado debe tanto alegar en su demanda que su despido fue injustificado como establecer que su caso es uno *prima facie* de discrimen.[86] Esto último, se logra demostrando que el empleado: (1) fue despedido; (2) sin justa causa, y (3) que está ubicado dentro de la modalidad de discrimen bajo la cual reclama.[87] Demostrado lo anterior, se establecerá una presunción de que el empleado fue despedido sin justa causa.[88] Ahora bien, dicha presunción puede ser derrotada por el patrono, demostrando de forma fehaciente que el despido estuvo justificado o que no fue a causa de motivos discriminatorios.[89] Si demuestra lo anterior, el empleado no tendrá otro remedio que probar que hubo discrimen intencional en el empleo, sin contar con la referida presunción.[90]

En el caso de marras, desde la presentación de la *Querella* que nos ocupa, no existió controversia en cuanto a que el motivo del despido de la apelante fue por razón de una reorganización. En específico, a consecuencia de una determinación empresarial de cerrar permanentemente, a nivel de todo los Estados Unidos, la división comercial a la cual estaba adscrita la apelante, razón por la cual despidieron a todos los empleados de ventas de la referida división. Según se desprende de los autos, el cierre de la división de CVM fue por consecuencia de que Xarelto, el cual era considerado el medicamento estrella de la aludida división, ya no necesitaba de una fuerza de ventas dedicada a la promoción y mercadeo del mismo.[91] De modo que, este, así como los demás productos bajo CVM iban a ser transferidos a una división en los Estados Unidos

---

[86] *López Fantauzzi v. 100% Natural*, supra, a la pág.124.
[87] *Íd.*
[88] *Íd.*
[89] *Íd.*
[90] *Segarra Rivera v. Int'l Shipping et al,* supra, a la pág. 990.
[91] Véase, SUMAC TPI, a la Entrada 20, pág. 12, párr. 54; *Íd.*, Anejo 1, pág. 45, líns. 24-25 y pág. 46, lín. 1, respectivamente; *Íd.*, Anejo 3, lín. 45; *Íd.*, Anejo 3, Exhibit 14. Véase, además, SUMAC TPI, a la Entrada 24, págs. 44-45, párr. 54.

intitulada "Established Products Group", la cual se encarga de los productos que ya están establecidos en el mercado.

Es harto conocido que una de las circunstancias que la Ley Núm. 80 establece como justa causa para el despido es el cierre total de una de las divisiones de un establecimiento.[92] Ello, puesto a que se ha razonado que esto es un escenario de índole económica en el cual el despido del empleado resulta inevitable dentro de las normas usuales y ordinarias que rigen el manejo de los negocios.[93] En vista de que la apelante, en ningún momento, levantó que el cierre de CVM fue por el mero capricho de Janssen,[94] así como que se demostró, a través de la solicitud de sentencia sumaria de esa compañía, que la aludida decisión fue por razón de modificar su forma de hacer negocios y optimizar sus recursos,[95] coincidimos en que hubo justa causa para el despido de la señora Torres Santiago. Ello, ya que indubitadamente su despido fue por razón de un cierre de operaciones *bona fide*. Así, pues, es de ver que aquí no cabe hablar de discrimen por edad. Según adelantamos, cuando el patrono derrota el hecho base de la presunción, de que el despido fue injustificado, el empleado debe demostrar por preponderancia de prueba que, en efecto, fue discriminado en el empleo, cosa que en este caso no ocurrió.[96] Conforme apoya el ordenamiento jurídico vigente, dado a que Janssen evidenció que el despido de la señora Torres Santiago fue justificado, no puede ser responsable de discrimen al amparo de la Ley Núm. 100.[97]

Ahora bien, cuando se despide a un empleado por razón de un cierre de operaciones se exige que el patrono retenga con preferencia a los empleados con más antigüedad, siempre que

---

[92] Artículo 2 (d) de la Ley Núm. 80, *supra.*
[93] *Segarra Rivera v. Int'l Shipping et al.*, supra, a la pág. 984.
[94] *Íd.*, a la pág. 985.
[95] *Íd.*, a la pág. 986, citando a *SLG Zapata-Rivera v. J.F. Montalvo*, supra, a la pág. 427.
[96] *Jiménez Soto y otros v. Carolina Catering Corp. y otros*, supra, a la pág. 26.
[97] *Mestres Dosal v. Dosal Escandón,* supra, a la pág. 73.

subsistan puestos vacantes u ocupados por empleados con menos años de servicio, dentro de su clasificación ocupacional, y que puedan ser desempeñados por el empleado despedido.[98] Asimismo, si dentro de los seis (6) meses de haberse despedido a un empleado, acaece la necesidad en la empresa de emplear a una persona con labores similares a las que desempeñaba el despedido, debe contratar a ese empleado con preferencia.[99]

En menester subrayar que, en casos como este, en el cual el patrono tiene varias divisiones, de ordinario, únicamente se exigirá la retención y el reempleo preferente dentro de cada establecimiento físico impactado por la reducción de personal.[100] Según bien explicó el foro *a quo*, dado a que la división a la cual estaba adscrita la apelante fue eliminada por completo y, a consecuencia de ello, todos los empleados dentro de su clasificación ocupacional en dicha división fueron igualmente despedidos, pese a su antigüedad en la empresa, no apoya el ordenamiento jurídico que su patrono tenía una obligación de retenerla o reemplazarla en alguna de las otras divisiones de Janssen.

Ahora bien, la apelante aduce que existe prueba incontrovertida en autos que demuestra que Janssen agrupó a todos los representantes de venta en una misma clasificación ocupacional, sin especificar a cuál división estaban adscritos. En mérito de lo anterior, nos dimos a la tarea de examinar los autos respecto a este particular, empero, de estos no surge la presunta prueba incontrovertida. Al contrario, se deprende de la *Moción de sentencia sumaria a favor de la querellante y oposición a solicitud de la querellada* presentada por la apelante, en la parte intitulada *Respuesta de Torres a los hechos esenciales y pertinentes que*

---

[98] Artículo 3 de la Ley Núm. 80, *supra.*
[99] *Íd.*
[100] *Íd.*, Artículo 3-A.

*Janssen representa que no existe controversia,* que esta admitió que los representantes de venta de Janssen estaban asignados a una división comercial en particular, en atención a los productos farmacéuticos que se comercializan bajo esa división.[101] Asimismo, la apelante, en la aludida moción, no presentó controversia, dado a que entendió que era una cuestión inmaterial, en cuanto al hecho de que cada división de Janssen estaba dirigida por un "Business Unit Director", así como que cada división tenía sus propios representantes de venta quienes se reportaban a un "Regional Sales Manager" dentro de su división.[102] Ante la falta de prueba que apoye la teoría de la señora Torres Santiago o que ponga en controversia los hechos propuestos por Janssen y fehacientemente probados, nos es forzoso coincidir con lo alegado por esta empresa de que sus divisiones tenían su propia fuerza de venta y estructura gerencial. Según explicamos en nuestra exposición doctrinal previa, cuando una empresa con diversas divisiones demuestra que estas operan de manera independiente respecto a las cuestiones de personal, esta únicamente estará obligada a computar la antigüedad de sus empleados en la división en el que se efectuó la reducción de personal.[103]

Ahora bien, cierto es que la misma Ley Núm. 80, establece que, en algunas ocasiones, se le exigirá a una empresa con distintas divisiones que compare la antigüedad del empleado cesanteado con la de los empleados de otras divisiones integradas a la empresa.[104] Sin embargo, será necesario probar que, "durante el año inmediatamente previo: (1) los empleados de las clasificaciones ocupacionales afectadas usual y frecuentemente se trasladaban de un establecimiento a otro; y (2) los empleados estaban bajo

---

[101] Véase, SUMAC TPI, a la Entrada 24, pág. 35, párr. 7.
[102] *Íd.*, párrs. 8-9.
[103] *Reyes Sánchez v. Eaton Electrical,* supra, a la pág. 604.
[104] Artículo 3-A de la Ley Núm. 80, *supra.*

supervisión directa común en la administración diaria del personal", cosa que en este caso no se probó.[105] Pese a que la señora Torres Santiago evidenció que, durante el espacio aproximado de veintisiete años (27) que trabajó en la empresa, se trasladó en unas cuatro (4) ocasiones a otras divisiones de Janssen y, en todas, ejerció un puesto como representantes de ventas, lo cual fue admitido por la aludida empresa,[106] esto no es suficiente para probar que los empleados de Janssen se trasladaban con frecuencia de una división a otra, o que estaban bajo una supervisión directa común. Es por lo anterior, que, a pesar de que la apelante alega que Janssen abrió varias plazas en otras divisiones, esta no tenía derecho a ser reempleada en las mismas con preferencia. Ello, dado a que se probó efectivamente por Janssen que cada división era independiente en cuanto a su personal y estructura gerencial, y, de ninguna manera, se evidenció, por parte de la señora Torres Santiago, que era uso y costumbre de la empresa trasladar a sus empleados de división en división. Así, pues, aunque la apelante alega que era la representante de ventas con más antigüedad en todo Janssen, esta únicamente tenía derecho a ser retenida o reempleada con preferencia en la división que sufrió reducción de personal, empero, esta división cerró permanentemente. En otras palabras, Janssen, ante el cierre permanente de CVM, a consecuencia de una reorganización *bona fide,* efectuada a través de todo el territorio de los Estados Unidos, no tenía potestad para retenerla o reemplearla con preferencia en otra división.

Sobre el anterior particular, es preciso señalar que, dejando fuera el estándar de prueba requerido por el ordenamiento jurídico vigente, para que se tomen en cuenta todas las divisiones de una empresa para el reempleo y/o la retención preferente, aunque es

---

[105] Artículo 3-A de la Ley Núm. 80, *supra.*
[106] SUMAC TPI, a la Entrada 20, págs. 7-10, párrs. 24-46.

cierto que Janssen abrió ciertas plazas en otras divisiones, la apelante admitió que estas no correspondían a su clasificación ocupacional y que no aplicó para ellas.[107] Asimismo, pese a que menciona que se abrió una plaza como representante de ventas en la división de inmunología,[108] igualmente, admitió que no aplicó para la misma, puesto a que no era una de las contempladas en la clasificación ocupacional de representante de ventas que ocupó durante sus años de servicio en Janssen, así como que carecía del conocimiento necesario para poder responder apropiadamente.[109]

Por todo lo antes expuesto, y luego de haber examinado detenidamente la totalidad de los autos ante nuestra consideración, así como las posiciones de las partes y los casos reseñados por la parte apelante en sus errores,[110] forzosamente no podemos llegar a otra conclusión de que lo actuado por el foro apelado fue lo correcto. En consecuencia, procede confirmar el dictamen apelado.

IV

Por los fundamentos que anteceden, se *confirma* la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[107] SUMAC TPI, a la Entrada 20, págs. 15-16, párrs. 75-84; *Íd*, a la Entrada 24, págs. 49-51, párrs. 75-84.
[108] *Íd.,* a la Entrada 24, págs. 3, 7, 23 y 25, respectivamente.
[109] *Íd*, pág. 51, párr. 84.
[110] Los casos subrayados por la apelante en sus errores fueron *Díaz v. Wyndham Hotel Corp., supra* y *McDonnell Douglas Corp. v. Green*, 411 US 792 (1973).